**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 16, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

DEAN RAMIREZ, also known as
Dean Castillo Ramirez, also known as
Dino; JOSE ANTONIO VAZQUEZ;
JULIO CESAR LOPEZ; and
EDUARDO MOZQUEDA-RAMIREZ,

       Defendants-Appellants.

Nos. 05-4099, 05-4103, 05-4108,
05-4111, & 04-4305

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. Nos. 1:03-CR-62-TC &**
**1:03-CR-69-TC)**

---

Jessica Stengel (Loren E. Weiss, with her on the briefs) Van Cott, Bagley,
Cornwall & McCarthy, Salt Lake City, Utah, for Defendant-Appellant Dean
Ramirez.

Hakeem Ishola of Ishola Law Firm, P.C., Salt Lake City, Utah, for Defendant-
Appellant Jose Antonio Vazquez.

Stephen R. McCaughey of Salt Lake City submitted a brief for Defendant-
Appellant Julio Cesar Lopez; and Roy D. Cole of Law Office of Roy D. Cole,
LLC, Ogden, Utah, submitted a brief for Defendant-Appellant Eduardo
Mozqueda-Ramirez.

Elizabethanne Claire Stevens, Assistant United States Attorney (Paul M. Warner,

United States Attorney, with her on the joint brief for all defendants), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **HENRY**, Circuit Judge, **McWILLIAMS**, and **SEYMOUR**, Senior Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

On May 1 and May 15, 2003, two separate grand juries returned multi-count indictments against Dean Ramirez, Julio Cesar Lopez, Jose Antonio Vasquez, Eduardo Mozqueda-Ramirez and others for a variety of crimes stemming from a drug trafficking enterprise. The two cases were consolidated for trial, and a jury found defendants guilty as follows: Mr. Ramirez, Mr. Vasquez, and Mr. Lopez on one count of conspiracy to distribute cocaine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 846; Mr. Lopez on one count of possession of 500 grams or more of a mixture or substance containing methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); Mr. Ramirez on two counts of possession of a firearm by a restricted person in violation of 18 U.S.C. § 922(g) and one count of use of a communication facility in a drug trafficking crime in violation of 21 U.S.C. § 843(b); and Mr. Mozqueda-Ramirez on one count of conspiracy to distribute 50 grams or more of a mixture or substance containing methamphetamine in violation of 21 U.S.C. § 846, and

two counts of possession of a firearm by a restricted person in violation of 18 § U.S.C. 922(g). The district court sentenced Mr. Ramirez to 30 years imprisonment, Mr. Vasquez to 10 years imprisonment, Mr. Lopez to 20 years imprisonment, and Mr. Mozqueda-Ramirez to 151 months imprisonment. All defendants appeal their convictions, and Mr. Ramirez and Mr. Mozqueda-Ramirez also appeal their sentences. We affirm.

## I

The record reflects that law enforcement officials engaged in a long-term investigation of a suspected drug trafficking conspiracy in Ogden, Utah. In the course of its investigation, the government sought and was granted authorization to wiretap the phone of Jose Aparicio, a.k.a. "Guido," a suspected member of the conspiracy. The government subsequently filed an application with the district court seeking authorization to wiretap Mr. Ramirez's cellular phone. With its application, the government included an affidavit from Agent John Barrett of the F.B.I. describing the accumulated evidence of Mr. Ramirez's involvement in drug trafficking.

In his affidavit, Agent Barrett described the role of a confidential source in gathering evidence of Mr. Ramirez's involvement in drug trafficking. The confidential informant spoke directly to Mr. Ramirez and his associates concerning the drug trafficking enterprise and corroborated information from an

anonymous tipster that hidden compartments were being installed in vehicles at Mr. Ramirez's auto repair shop for use in smuggling drugs. Under law enforcement supervision, the informant made a number of drug purchases in which Mr. Ramirez was the suspected supplier. On January 29, 2001, the confidential informant consummated a drug deal with Francisco Madrigal, an alleged co-conspirator of Mr. Ramirez, involving methamphetamine and cocaine that Mr. Ramirez was suspected of supplying. Pen register analysis of Mr. Madrigal's phone indicated Mr. Madrigal called Mr. Ramirez twice during the drug transaction.

Agent Barrett recounted in his affidavit the stop of Mr. Ramirez for a traffic violation following his visit to Mr. Madrigal's house. The suspected purpose of the visit was to supply Mr. Madrigal with drugs for an upcoming sale to the confidential informant. The particulars of the stop of Mr. Ramirez are described in greater detail below in the context of a motion to suppress. At this point, we note only Mr. Madrigal's statements in a nearly concurrent traffic stop. During that stop, Mr. Madrigal identified Mr. Ramirez as the source of cocaine and methamphetamine discovered in the search of his vehicle.

In further support of its application for a wiretap, the government relied upon conversations between Mr. Ramirez and Mr. Aparicio overheard on Mr. Aparicio's wiretapped phone. During those conversations, Mr. Aparicio told Mr. Ramirez that he "has a dude that wants to buy some iron," and that it sells for

$100.00 to $150.00." *See* Wiretap Aff. ¶ 46. Mr. Aparicio and Mateo Garcia, a.k.a. "Nene," then drove to and entered Mr. Ramirez's shop, where closed circuit television surveillance recorded Mr. Garcia exiting the shop with a small object.[1] A subsequent traffic stop for a moving violation turned up a firearm and a box of ammunition matching the description of the removed object. On February 27, 2003, Mr. Aparicio had another conversation with Mr. Ramirez in which he said "Nene wants the gun," and asked if Mr. Ramirez will "take the gun to the shop." *Id.* ¶ 52. Mr. Ramirez agreed to send someone to retrieve the gun. Other calls included statements by Mr. Aparicio that he "had the stuff" and was on his way, *id.* ¶ 73, and requests by Mr. Ramirez for an "8," a term believed to refer to a 1/8 ounce of cocaine. *Id.* ¶ 75. In total, Mr. Aparicio had 542 contacts over his wiretapped line with Mr. Ramirez's cellular phone between October 2002 and March 2003.

On March 24, 2003, the district court issued an order authorizing the wiretap of Mr. Ramirez's cellular phone. Numerous conversations were subsequently monitored and recorded pursuant to the order. Prior to trial, several defendants filed motions to suppress the evidence obtained from the Ramirez wiretap, arguing the government failed to make the necessary showings to obtain

---

[1] From September 2002 through March 2003 FBI agents physically surveilled Mr. Ramirez and his associates. In addition, law enforcement observed the entrances of Mr. Ramirez's home and auto repair business with closed circuit television cameras.

the order and failed to adequately minimize the interception of non-pertinent conversations. The district court found that two prerequisites for the authorization of a wiretap order – probable cause and necessity – were met. The issue of adequate minimization was deferred for further proceedings.

The government thereafter submitted a memorandum, including an affidavit by Agent Barrett, in opposition to suppression of the wiretap evidence on minimization grounds. In his affidavit, Agent Barrett described the VoiceBox III computer program used to collect and store wiretap data and the written procedure for the minimization of non-pertinent calls.[2] Defendants expressed the following concerns with particular sets of calls: forty-one calls on the Ramirez line where the computerized monitoring program failed to disclose the time counts for minimizations; sixteen calls over two minutes which may or may not have been minimized and which were allegedly not pertinent and should have been minimized; twelve non-minimized calls over two minutes that were allegedly non-pertinent; and nineteen calls over two minutes for which there is no audio

---

[2] *See* Ramirez Rec., vol. III, doc. 110 at 3 ("If you terminate the interception because the conversation is not pertinent, you may spot-monitor the conversation to see if its character changes. After a thirty (30) second interval, the equipment may be activated for approximately thirty (30) seconds to determine if the conversation continues to be not pertinent. The speakers and/or the nature of the conversation may change. This procedure of spot-monitoring may be continued throughout the conversation, but should be kept to the minimum necessary to ascertain whether the conversation has changes. If during the spot-monitoring, the conversation is determined to be pertinent, full interception of the conversation is then appropriate so long as the conversation remains pertinent.").

recording or synopsis. The government responded directly to each of these assertions by way of Agent Barrett's affidavit. The district court concluded: "it's very clear from the affidavit of Agent Barrett that the general minimization effort certainly satisfied the statute . . . [and] it appears to me quite clear that the wiretap statute requirements were complete as far as minimization." Vasquez Rec., vol. IV at 15-16. Accordingly, the district court held the wiretap recordings admissible.

The wiretap of Mr. Ramirez's phone recorded a number of incriminating conversations. The conversations were peppered with terms whose common meanings are entirely innocuous. At trial, however, the government presented evidence of alternate definitions for these terms as they are used in the drug trade. In all, the recorded calls from the Ramirez and Aparicio wiretaps produced several hundreds pages of transcribed dialogue, which we describe in the context of the relevant claims.

In addition to the wiretap evidence, Mr. Ramirez sought suppression of the fruits of two unrelated traffic stops. The first stop on February 16, 2001, was rooted in an arranged drug deal between the government's confidential informant and Mr. Madrigal. Mr. Madrigal told the informant the drugs would be delivered to his house prior to the sale, and law enforcement established surveillance of Mr. Madrigal's house in anticipation of the supplier's arrival. The surveilling officers observed a white pick-up truck containing two Hispanic males arrive at the

residence. The driver entered the house and, a short time later, exited and drove away. An officer positioned nearby stopped the truck shortly thereafter for a traffic violation. The driver was identified as Dean Ramirez. The officer, after returning Mr. Ramirez's relevant documentation, asked if he could search the vehicle. Mr. Ramirez consented, and the officer found $5,060.00 hidden in the gearshift boot on the floor of the truck. Mr. Ramirez denied ownership of the money and speculated the cash belonged to a mechanic who had recently worked on the vehicle.

On May 15, 2002, Agent Troy Burnett observed a white truck, different from the one involved in the February 2001 stop, driving above the speed limit. When Agent Burnett caught up with the vehicle, it was parked at the house of a known drug user and alleged drug distributor. From the vantage point of his police cruiser, Agent Burnett observed an individual entering the driver's side of the truck. Agent Burnett concluded that the truck could not have been parked for "more than a minute or so" before the driver was seen entering it. *Id.* Agent Burnett pulled up behind the truck before it could drive away and engaged his police lights. He exited his vehicle, and Mr. Ramirez exited the white truck. Agent Burnett and Mr. Ramirez recognized each other from prior encounters and addressed each other by name. The agent obtained Mr. Ramirez's driver's license, vehicle registration, and proof of insurance.

Near the outset of the stop, Agent Burnett requested the assistance of a

canine unit. Before the dog arrived, the agent sought and was denied consent from Mr. Ramirez to search the truck. He then questioned both Mr. Ramirez and the resident of the house. Mr. Ramirez told the officer he had gone to the home to obtain auto parts. The resident of the house said Mr. Ramirez had come to borrow a magazine. During these interactions Agent Burnett gauged Mr. Ramirez's demeanor to be more anxious than in their prior encounters. After the arrival of the canine unit, the dog performed a sniff of the exterior of the truck. It scratched and barked at the driver's side door, the signal indicating the presence of drug odors, and the officers and the dog began an interior search of the truck. Agent Burnett discovered $30,020 in the vehicle.

Prior to trial, Mr. Ramirez challenged the legality of both stops and sought to suppress the money retrieved from the searches. After a hearing, the district court concluded that Mr. Ramirez had voluntarily consented to the February 2001 vehicle search, and that the May 2002 detention was justified by reasonable suspicion and the interior search was supported by probable cause. Although the evidence obtained in both searches was deemed admissible on Fourth Amendment grounds, the money discovered in the February 2001 stop was not admitted at trial after the district court concluded its prejudicial effect outweighed its probative value. The court determined the money found in the May 2002 search was admissible, and the government presented that evidence at trial.

Also prior to trial, Mr. Mozqueda-Ramirez's counsel, Roy. D. Cole,

petitioned the court for leave to withdraw as counsel. Less than two weeks before the start of trial, a hearing was held before a magistrate judge to examine the merits of the petition. At the hearing, Mr. Mozqueda-Ramirez's counsel stated that the "change we've had" is that "Mr. Mozqueda-Ramirez does not want me on this case anymore." Ramirez Rec., supp. vol. VII at 4. The magistrate judge denied the petition, noting the district court would not delay the swiftly approaching consolidated trial and Mr. Mozqueda-Ramirez had a lawyer who was up to speed on the evidence and had personally discussed the evidence with Mr. Mozqueda-Ramirez.

In addition to the contested traffic stops, there were a number of searches of defendants and their associates that produced relevant evidence. On January 8, 2003, Agent Aaron Johnson of the Ogden City police department visited several apartments at 1095 16th Street in response to an anonymous complaint of drug activity at that address. The agent initially knocked on the door of apartment four, but was told by the residents of the unit that the prior occupants had moved to apartment five. He then knocked on the door of apartment five. At the time of the search, Michael Hurst owned unit five and had lived there when Mr. Lopez and a man known as Javier lived in apartment four. Mr. Hurst testified that while he lived in apartment five, Mr. Lopez, known to him as Emilio Felix, had on at least one occasion supplied him with a small amount of methamphetamine.

When Mr. Hurst vacated apartment five, he left behind a step exercise

-10-

machine. In early November, Mr. Lopez and Javier moved in and began paying rent to Mr. Hurst. By mid-November, Mr. Lopez had "faded away," Ramirez Rec., vol. XIII at 168, and was living with his wife "somewhere out north." Ramirez Rec., vol. XIV at 7. By mid-December, both of the original occupants had vacated the apartment and it was occupied by Raul Gaitan-Dominguez and Jesus Solis-Gaona. Javier paid December's rent for the apartment. Mr. Hurst contacted the apartment's residents after the January rent was late and asked to speak with Mr. Lopez. One of the then-current occupants called Mr. Lopez, and after a short conversation between Mr. Hurst and Mr. Lopez, one of the new residents paid Mr. Hurst the January rent.

On the day of the search, Mr. Gaitan-Dominguez consented to Agent Johnson's search of apartment five. During the search, Agent Johnson noticed numerous rolls of packing tape and plastic wrap products in a closet just off the living room. Further investigation of the closet uncovered methamphetamine in a "ball about the size of a softball" stored in a plastic grocery bag. Ramirez Rec., vol. XIII at 92. More methamphetamine was found in the kitchen packaged in one pound bricks.[3] The methamphetamine bricks were individually packed inside a ziploc style bag, wrapped in plastic wrap sprayed with what Agent Johnson described as a "cleaning agent" that "smelled like Lysol," then wrapped again

---

[3]The two bricks weighed between 437 and 443 grams and were between 95 and 96 percent pure. *See* Ramirez Rec., vol. XIII at 95.

with plastic wrap, and finally covered by tape. *Id.* at 94. Agent Johnson located a number of other items in the apartment, including Mr. Gaitan-Dominguez's Mexican passport; a vehicle title in Mr. Lopez' name with the apartment five address; a letter to Mr. Lopez from a collection agency for past due gas payments at the apartment five address; a phone bill addressed to Mr. Lopez at the apartment five address; and a number of photographs picturing Mr. Lopez and Mr. Gatain-Dominguez, among others.

Mr. Gaitan-Dominguez and Mr. Solis-Gaona were arrested in connection with the discovery of methamphetamine in apartment five. After their arrest, the two men placed phone calls from prison that were recorded by the prison phone system. On January 14, 2003, Mr. Gaitan-Dominguez called Diana Murillo, with Mr. Lopez allegedly listening on Ms. Murillo's end, *see* Gov't Ex. 1R-T1 at 2 ("Hey! Jul . . . he's going to talk "), and told Mr. Lopez to "get those things out, as soon as you can and hurry up." *Id.* Mr. Solis-Gaona called Ms. Murillo on the same day and had further discussions about "tak[ing] the things out of the house." Gov't Ex. 1R-T3 at 2. On January 24, Mr. Gaitan-Dominguez called Mr. Lopez from prison to ask that Mr. Lopez "move it, man, before they make this into a bigger deal." Gov't Ex. IR-T3 at 3.

On April 18, 2003, Agents Burnett and Johnson conducted a consent search of the residence of Mr. Galaz-Feliz, a suspected member of the conspiracy. The officers recovered a firearm, $26,175 in cash, and what were interpreted to be

drug accounting ledgers or pay/owe sheets.[4] During the search, a drug dog alerted to a slashed tire in the basement of the house. The officers reported Mr. Galaz-Feliz was talking on the phone during the search and was overheard requesting the other party get a hold of Dinosaurio.[5] On the evening of the search of Mr. Galaz-Feliz's residence, the Ramirez wiretap captured a number of conversations about the search.

On April 28, 2003, Agent Johnson searched a storage unit in Ogden pursuant to a search warrant. According to storage business records, that unit was leased to Emilio Felix, an alias used by Mr. Lopez. In the unit, Agent Johnson discovered a photograph of Mr. Lopez; an insurance policy for Emilio Felix at 1095 16th Street, Apartment Four; a box of sandwich bags; a digital scale; plastic wrap with a "lysol type smell . . . exactly alike . . . to the stuff that the methamphetamine was packaged in apartment number five;" and methamphetamine residue in the packaging as confirmed by chemical analysis. Ramirez Rec., vol. XIII at 123.

Finally, law enforcement officials seized two cellular phone receipts from Mr. Vasquez when he was arrested. At the time of his arrest, he did not possess

_____

[4] Agent Barrett testified at length about the contents of the documents and his conclusion that the papers were used as drug ledgers. *See* Ramirez Rec., vol. XIV at 102-136.

[5] The government alleged throughout the trial that Dinosauri and Dino were nicknames for Dean Ramirez. *See* Ramirez Rec., vol. XIII at 80 (Agent Johnson testified "Dean Ramirez uses the name Dinosaurio also.")

drug related materials, firearms, or large sums of cash. *See* Ramirez Rec., vol. XVII at 60; Ramirez Rec., vol. XVI at 20. Mr. Vasquez unsuccessfully argued against the admission of the receipts as hearsay evidence before the district court.

**II**

For ease of analysis, we have divided the claims from the four separate appeals into four thematically related subgroups: admissibility of evidence, sufficiency of the evidence, issues with counsel, and sentencing. The first group, contentions that particular pieces of evidence were wrongly admitted, includes the conversations recorded by the Ramirez wiretap; the fruits of Mr. Ramirez's two traffic stops; the cell phone receipts found on Mr. Vasquez upon his arrest; and co-conspirator statements challenged by Mr. Vasquez. The second group includes Mr. Lopez's argument that there was insufficient evidence to convict him for possession with intent to distribute methamphetamine, and Mr. Lopez, Mr. Mozqueda-Ramirez, and Mr. Vasquez's claims that there was insufficient evidence to support their respective conspiracy convictions. The third category consists of Mr. Mozqueda-Ramirez's claim of ineffective assistance of counsel and his appeal of the district court's denial of his counsel's motion to withdraw prior to trial. The final section focuses on Mr. Mozqueda-Ramirez's challenge to the application of mandatory minimums in light of *Booker*, and Mr. Ramirez's arguments about the constitutionality of sentencing factors in relation to his

sentence and the vagueness of his underlying charge.

## ADMISSIBILITY OF EVIDENCE

### 1. Ramirez Wiretap

Mr. Lopez , Mr. Ramirez, and Mr. Vasquez argue the district court erred in authorizing the Ramirez wiretap and, as a result, the evidence obtained via the wiretap should be suppressed. They variously attack the wiretap order on the grounds that the government failed to demonstrate probable cause, necessity, and proper minimization. We address each of the three issues below and conclude the district court properly authorized the wiretap and admitted the recorded conversations as evidence at trial.

#### a. Probable Cause

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 requires the government to demonstrate "probable cause for belief that an individual is committing, has committed, or is about to commit" a specified criminal offense as a prerequisite for the authorization of a valid wiretap. 18 U.S.C. § 2518(3)(a). Defendants argue this requirement was not met with respect to the wiretap of Mr. Ramirez's cellular phone. We review the district court's finding of probable cause "to determine whether the facts and circumstances within the officer's knowledge based on reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense has

or is being committed." *United States v. Armendariz*, 922 F.2d 602, 608 (10th Cir. 1990).

In evaluating the presence of probable cause, we look primarily to the government's wiretap application and Agent Barrett's attached affidavit. The agent described a number of specific conversations implicating Mr. Ramirez in the distribution of contraband. Among those were a pen register analysis showing two phone calls placed to Mr. Ramirez by Mr. Madrigal during a drug deal with a confidential source, *see* Wiretap Aff. ¶ 23, and a series of recorded phone calls between Mr. Ramirez and Mr. Aparicio[6] in which the two parties discussed the sale of guns and drugs either explicitly or in code. *See* Wiretap Aff. ¶ 52 ("[Mr. Aparicio] then asked Ramirez, if he'll 'take the gun to the shop.'"); *Id.* at ¶ 62 (Ramirez asked Mr. Aparicio "for more cold one," allegedly in reference to methamphetamine); *id.* ¶ 73 (Mr. Aparicio told Mr. Ramirez he "had the stuff"); *id.* ¶ 75 (Mr. Ramirez asked Mr. Aparicio for an "8," an alleged reference to an 1/8 ounce of cocaine, and stated he had the money). In light of this information, we conclude a person of reasonable caution could believe a crime had been committed. Thus, the order authorizing the wiretap of Mr. Ramirez's phone was supported by probable cause.

---

[6] Those conversations were recorded by the authorized wiretap of Mr. Aparicio's phone. The validity of that wiretap was not challenged by defendants.

### b. *Necessity*

Defendants assert the government failed to adequately demonstrate the necessity of wiretapping Mr. Ramirez's phone. We review a district court's determination that a wiretap was necessary for an abuse of discretion. *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002). If defendants "succeed[] in showing that the necessity requirement was not met, evidence seized pursuant to the wiretap must be suppressed." *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003). Once a wiretap has been authorized, defendants bear the burden of proving it was invalid. *Id.*

"Title III contains a 'necessity' requirement . . .which must be satisfied before a wiretap order may be lawfully issued." *United States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th Cir. 1997) (overruled on other grounds). When requesting a wiretap, the government must provide the court with "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The court must then be convinced "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous" before authorizing the requested wiretap. 18 U.S.C. § 2518(3)(c). This precondition for the issuance of a wiretap order ensures "the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative

-17-

techniques would suffice to expose the crime." *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995) (internal quotation marks omitted).

In a wiretap application, the government must explain how normal investigative techniques have been used in its attempts to gather evidence against the target of the wiretap, or in the alternative, why "untried techniques would be either unsuccessful or too dangerous" in serving that purpose. *Castillo-Garcia*, 117 F.3d at 1187. Normal investigative procedures include:

> 1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous.

*Id.* at 1187. The "necessity" requirement does not require that law enforcement officials exhaust all of the above procedures prior to the issuance of a wiretap warrant. The statutory requirement can be met if the government demonstrates either normal investigatory techniques have been tried and failed or that they "reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try." *Id.*

Mr. Lopez asserts the wiretap affidavit "did not illustrate, with particularity, the necessity for the wiretap." Lopez Br. at 19. Mr. Lopez cites *Castillo-Garcia* extensively in an attempt to analogize that case's invalidated

wiretap to the wiretap of Mr. Ramirez's phone. The wiretap application in *Castillo-Garcia*, however, was supported by "wholly conclusory language" without the benefit of a particularized discussion of how normal investigative techniques were used, or why they were not used, against the target. *Castillo-Garcia*, 117 F.3d at 1194. As is evident from our discussion below, the Ramirez wiretap does not suffer from the same infirmity.

Looking at each investigative technique in turn, we first consider the prior use of visual and aural surveillance. As described in the affidavit, law enforcement officials recorded the comings and goings of individuals into and out of Mr. Ramirez's auto repair shop and home via closed circuit television cameras.[7] Furthermore, FBI agents physically surveilled Mr. Ramirez from September 2002 to March 2003. According to the government, this video monitoring and physical surveillance did not reveal "which individuals with whom Dean Ramirez associated, if any, were criminal members or customers of his drug enterprise." Wiretap Aff. ¶ 107. Thus, the government demonstrated it had tried physical and visual surveillance and adequately explained its failure, namely, the inability of physical and visual surveillance to distinguish between legitimate customers of Mr. Ramirez's auto business and those associates engaged

_____

[7]Law enforcement officials primarily relied upon video monitoring and not physical surveillance because Mr. Ramirez home and business were "located in residential neighborhoods, making static physical surveillance difficult." Barrett Wiretap Aff. ¶ 103.

in drug trafficking.

Second, Agent Barrett demonstrated that the government had utilized a confidential informant with significant connections to Mr. Ramirez and his associates.  The informant "spoke[] directly to Dean Ramirez and his associates concerning the drug trafficking activities of Dean Ramirez," made supervised drug buys, and spent a "considerable amount of time meeting with [an associate of Mr. Ramirez] in a social setting." *Id.* ¶ 9.  Investigators, however, found that even this well-connected confidential source was "unable to gather detailed information about Ramirez's Organization or its suppliers." *Id.* ¶ 97.  They did not utilize confidential sources from related investigations because those informants did not have sufficiently strong ties to Mr. Ramirez, *id.* ¶ 101, and they did not attempt to insert an undercover agent because they believed an unfamiliar agent would have been less likely to succeed than an informant already in the confidences of the conspirators. *See Castillo-Garcia*, 117 F.3d at 1189. We are persuaded the government demonstrated it used a confidential informant to limited avail, and adequately explained why an undercover agent or additional informant would have been unlikely to succeed.

Third, Agent Barrrett explained why interrogation of the participants or use of a grand jury coupled with grants of immunity was not tried.  In prior cases, we have found "the risk that witnesses would . . . claim their Fifth Amendment privilege, or inform principal suspects of the investigation outweighed modest

-20-

potential evidentiary gains." *United States v. VanMeter*, 278 F.3d 1156, 1164 (10th Cir. 2002). *See also Castillo-Garcia*, 117 F.3d at 1192. Similar fears were articulated in the Ramirez affidavit because many of the "possible witnesses [we]re conspirators themselves." Wiretap Aff. ¶ 109. Additionally, it was reasonable to assume that police questioning could compromise the safety of witnesses and the investigation of Mr. Ramirez's enterprise in light of what investigators knew about the target. *See id.* ¶ 118 (confidential informant "was advised . . . that Ramirez had considered killing Madrigal for speaking to the police"). Thus, it would appear interrogation or use of a grand jury would have been both unlikely to succeed and potentially dangerous.

And finally, the use and failure of the remaining methods of normal surveillance were also well explained. As to search warrants, the affidavit stated "search warrants, consent to search investigations, and searches incident to arrest . . . executed against [individuals] and residences associated with Ramirez have failed to identify the full scope criminal enterprise." *Id.* ¶ 120. Pen registers were applied to Mr. Ramirez's phones, but the registers did not identify the actual participants in the phone calls or provide sufficient evidence of criminal activity.

In sum, the record clearly demonstrates how each investigatory technique was tried and why it failed, or why any unutilized method was likely to be ineffective. These techniques were described not with broad generalities but with particularity to the ongoing investigation of Mr. Ramirez. Consequently, the

-21-

district court did not abuse its discretion by concluding the wiretap was necessary.

### c. *Minimization*

Defendants assert law enforcement officials failed to "minimize the interception of communications not otherwise subject to interception" as required by 18 U.S.C. § 2518(5). In reviewing whether the statutory minimization requirement is met, we examine "the reasonableness of the agents' efforts to refrain from monitoring conversations deemed nonpertinent to the investigation." *United States v. Willis*, 890 F.2d 1099, 1101 (10th Cir. 1989).

We read defendants' briefs to allege minimization problems with three specific sets of calls. When these same concerns were raised to the district court, the government submitted a detailed affidavit from Agent Barrett explaining the general minimization protocol and directly responding to defendants' questions about particular calls. The first allegedly troubled set of calls are those where the line sheets generated by the listening software did "not disclose the time counts for minimization." Lopez Br. at 23. However, as was noted in his affidavit, Agent Barrett manually retrieved that information and provided the data to defendants. Ramirez Rec., vol. III, doc. 110, att. A ¶ 18. Second, Mr. Lopez contends a number of calls from the Ramirez wiretap were non-pertinent and should have been minimized, *see* Lopez Br. at 23, but the government printed the screen image for each contested call and explained how each call was evaluated.

*See* Ramirez Rec., vol. III, doc. 110, att. A ¶ 20.  Lastly, Mr. Lopez asserts audio recordings and synopses were not provided for nineteen calls.  Agent Barrett concluded six of the calls were "hookflash"[8] and ten were neither monitored nor recorded by law enforcement.  *Id.* att. A ¶ 21.  In light of these explanations, and because we review minimization for the reasonableness of the efforts of law enforcement officials and not the perfection of their results, we conclude the Ramirez wiretap was properly minimized.

### 2. Constitutionality of Stops and Searches of Mr. Ramirez

Mr. Ramirez argues the district court erroneously admitted evidence seized during two allegedly unlawful traffic stops.  On February 16, 2001, an Ogden police officer stopped Mr. Ramirez for failing to signal while he was driving a white truck.  The stop resulted in the discovery of $5,060 in cash hidden in the gearshift boot.  On May 15, 2002, Agent Burnett stopped Mr. Ramirez's truck outside the house of a known drug user and suspected drug dealer after observing Mr. Ramirez speeding.  An alert from a dog sniff on the exterior of Mr. Ramirez's truck led to an interior search that uncovered $30,020 in cash.

Because the government did not introduce the $5,060 found in the first search as evidence at trial, the issue of the lawfulness of the February search is

---

[8] *See* Lopez Rec., vol. II, doc. 223, Att. C (defining hookflash as "[m]omentarily depressing the hookswitch (up to 0.8 of a second) [which] can signal various services such as calling the attendant, conferencing or transferring calls.")

moot. *See United States v. Arias-Villanueva*, 998 F.2d 1491, 1502 (9th Cir. 1993) (impliedly overruled on other grounds). With respect to the May 15, 2002 traffic stop, we accept the district court's factual findings unless they are clearly erroneous and view the evidence in the light most favorable to the government. *See United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). The ultimate determination of reasonableness under the Fourth Amendment is a question of law we review de novo. *United States v. Zabalza*, 346 F.3d 1255, 1258 (10th Cir. 2003).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A routine traffic stop is a "seizure" within the meaning of the Fourth Amendment, *see Delaware v. Prouse*, 440 U.S. 648, 653 (1979), examined according to the principles outlined in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). *See United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005). "To determine the reasonableness of an investigative detention, we make a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (quoting *Terry*, 392 U.S. at 20).

The first inquiry under *Terry* is whether the stop was justified at its inception. *Id*. "[A] traffic stop is valid under the Fourth Amendment if the stop

-24-

is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc). Mr. Ramirez does not dispute the validity of the initial stop for speeding, and he limits his challenge to the length and scope of his detention after Agent Burnett initiated the stop. Our analysis is similarly limited.

Mr. Ramirez argues, in accord with the second inquiry of *Terry,* that the investigative stop "exceeded the reasonable scope and duration of a traffic stop." Ramirez Br. at 32. If we were to look only to the original justification for the stop, as Mr. Ramirez seems to suggest, he would be correct. After a validly initiated traffic stop, however, an "officer may detain a motorist for questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." *Williams*, 403 F.3d at 1206. In this instance, there is no indication that the initial stop developed into a consensual encounter. Agent Burnett, however, had reasonable suspicion that criminal activity (other than the traffic violation) had occurred, thus justifying temporarily detaining and questioning Mr. Ramirez while awaiting the arrival of the canine unit.

When evaluating the existence of reasonable suspicion, we look to the "totality of circumstances" to see whether the detaining officer had a "particularized and objective basis for suspecting legal wrongdoing." *United*

-25-

*States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted).

> Factors, which when taken separately may be perfectly innocent behavior, can support a finding of reasonable suspicion when taken together. Conversely, although the nature of the totality of the circumstances makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation. In analyzing the factors that may amount to reasonable suspicion, we must be careful to judge the officer's conduct in light of common sense and ordinary human experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances.

*United States v. Wallace*, 429 F.3d 969, 975-76 (10th Cir. 2005) (citations, brackets, and quotation marks omitted). The district court discussed the following factors in holding that Agent Burnett had reasonable suspicion to believe a crime had occurred or was occurring: (1) the truck was seen parked outside a residence Agent Burnett knew to be associated with drug-dealing; (2) he saw the driver enter his vehicle after a stop of extremely short duration; (3) he had personal knowledge of Mr. Ramirez's participation in drug-trafficking; (4) Mr. Ramirez and the resident of the house gave different reasons for the visit; and (5) Mr. Ramirez's nervous behavior was inconsistent with his demeanor during previous interactions with the police.

With respect to the location of the truck, the Supreme Court has instructed that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant

further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Moreover, Officer Burnett testified "visits of extremely short duration" like Mr. Ramirez's "are a key indicator of drug activity." Ramirez Rec., vol. II, doc. 288 at 10. *See also* Ramirez Rec., vol. VII at 18. We have previously recognized a "trained officer's ability to distinguish between innocent and suspicious circumstances" even where the conduct has an otherwise innocuous veneer. *See United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001). Thus, although a short stop at the residence of a known drug user and suspected narcotics dealer might have an innocent explanation, we accord deference to a trained "law enforcement officer's ability to distinguish between innocent and suspicious actions." *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997).

At the time of the stop, Officer Burnett was participating in the ongoing investigation of Mr. Ramirez for drug trafficking. "[K]nowledge of a person's prior criminal involvement . . . can . . . be a factor, along with other factors, giving rise to an articulable suspicion." *United States v. McRae*, 81 F.3d 1528, 1535 n.5 (10th Cir. 1996). *See* Ramirez Rec., vol. II, doc. 288 at 2. In addition, Agent Burnett noticed that Mr. Ramirez seemed "very nervous" and "evasive," a manner of behavior that was "distinct[ly] differen[t]" than in previous police encounters. Ramirez Rec., vol. VII at 51. Although we are typically chary of affording evidentiary weight to a defendant's nervousness in light of the commonly unnerving nature of police stops, Agent Burnett's observations

-27-

recognized behavior relative to an individualized baseline and was not making simply another "generic claim[] that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials." *United States v. Hall*, 978 F.2d 616, 621 n.4 (10th Cir. 1992). *Compare id.* at 621 ("neither officer had any prior contact with Defendant with which to compare her behavior, thereby making Defendant's nervous appearance to the officers merely a hunch."). Considering, as we must, all of these facts in their totality, *see Williams*, 403 F.3d at 1207, we conclude Agent Burnett had the necessary "particularized and objective basis for suspecting legal wrongdoing" to continue the stop. *United States v. Arvizu*, 534 U.S. at 273 (internal quotation marks omitted).

This conclusion represents only the first of two *Terry* inquiries. Having determined the drug investigation was supported by reasonable suspicion, we must still assess whether the stop was reasonably related in scope to the circumstances justifying the interference. *Bradford*, 423 F.3d at 1156. We first note that the dog sniff of the exterior of Mr. Ramirez's vehicle did not require additional cause or suspicion, *see Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005), and that Agent Burnett's reasonable suspicion was sufficient to justify a short detention to await the arrival of a drug sniffing dog. *United States v. Mendoza*, 468 F.3d 1256, 1261 (10th Cir. 2006). Mr. Ramirez argues the length of detention was improper, but we have previously held a delay of thirty-eight

-28-

minutes awaiting the arrival of a canine unit, *United States v. Villa-Chaparro*, 115 F.3d 797, 802-03 (10th Cir. 1997), and a 50-minute total detention while engaging in a canine search, *United States v. Cervine*, 347 F.3d 865, 872-73 (10th Cir. 2003), were both proper detentions for reasonable suspicion. Mr. Ramirez has pointed to nothing in the record that would indicate he was detained for a longer period of time,[9] and we conclude the scope and duration were reasonably related to the purpose of the detention. Furthermore, once the dog alerted to the driver's side door, Officer Burnett had probable cause to search the interior of the truck. *See United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004). Given that Agent Burnett had reasonable suspicion, that the scope and duration of the subsequent detention were reasonable, and that he had probable cause to search the inside of the vehicle, the detention and search did not violate Mr. Ramirez's Fourth Amendment rights.

## 3. Admissibility of Cellular Phone Receipts

At trial, the government sought to offer two cellular phone receipts possessed by Mr. Vasquez at the time of his arrest as evidence of his involvement in the conspiracy. The district court admitted the receipts over Mr. Vasquez's hearsay objection, which he renews on appeal. "Evidentiary rulings are

---

[9]Mr. Ramirez seeks to establish the extreme length of his detention by discussing the apparently dead battery his vehicle suffered during the stop. *See* Ramirez Br. at 32. But he also acknowledges the "government estimates the traffic stop lasted about thirty minutes," without directly contesting this conclusion. *See id*.

committed to the discretion of the trial court, and we review them only for abuse of discretion. Our review is even more deferential where the evidentiary ruling concerns the admissibility of what is claimed to be hearsay evidence." *United States v. Cestnik*, 36 F.3d 904, 906-07 (10th Cir. 1994) (citation omitted).

Hearsay evidence, defined as a "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c), is generally inadmissible unless the statement is explicitly defined as not hearsay, *see* Fed. R. Evid. 801(d), or falls under an exception to the hearsay rule, *see* Fed. R. Evid. 802. In *United States v. Jefferson*, 925 F.2d 1242, 1252 (10th Cir. 1991), we held a pager bill used to prove the truth of the matter asserted, namely that the defendant purchased the pager, constituted hearsay. *See also United States v. Markopoulos*, 848 F.2d 1036, 1039 (10th Cir. 1988) (receipts are improperly admitted hearsay evidence). By contrast, in *United States v. Pulido-Jacobo*, 377 F.3d 1124 (10th Cir. 2004), we held a two month-old receipt for a set of speakers was not hearsay because it represented an adoptive admission under Federal Rule of Evidence 801(d)(2)(B). Rule 801(d)(2)(B) provides that where a "statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth," it is not hearsay. FED. R. EVID. 801(d)(2)(B). The question here is whether the phone receipts obtained from Mr. Vasquez are an adoptive admission, as in *Pulido-Jacobo,* and thus are admissible non-hearsay, or

-30-

are simply inadmissible hearsay as in *Jefferson*.

In *Jefferson*, we classified the pager bill as hearsay and broadly rejected the application of adoptive admissions to bills due to the frequent "inaccuracies contained" within them. *Jefferson*, 925 F.2d at 1253 n.13. Reexamining the application of the adoptive admission rule to bills in *Pulido-Jacobo*, we determined Jefferson's pager bill was not an adoptive admission because "[o]ther than [Mr. Jefferson's] name on the bill, no evidence existed that the defendant manifested a belief in the truth of the bill's contents." *Pulido-Jacobo*, 377 F.3d at 1132. Turning to the facts of the case then at hand in *Pulido-Jacobo*, we concluded the speaker receipt at issue represented an adoptive admission. We distinguished the two documents on two grounds: that Mr Pulido-Jacobo "kept his receipt for over two months after the speaker purchase," and that "the officers found speakers in the trunk of the car matching those described in the receipt." We concluded that these "surrounding circumstances tie[d Mr. Pulido-Jacobo] and the document together in some meaningful way" not present in *Jefferson*. *Id.* (quotation marks omitted).

After reviewing the record in this case, we are persuaded the context of Mr. Vasquez's cellular receipt more closely mirrors those of the pager bill in *Jefferson* than the receipt in *Pulido-Jacobo*. Mr. Vasquez's receipts were dated April 21, 2003, and he was arrested in possession of the receipts on April 28, 2003. Thus, he possessed the receipts for only a single week, far less than the two months that

carried the day in *Pulido-Jacobo*. The facts of this case further differ from those in *Pulido-Jacobo* in that the government did not demonstrate Mr. Vasquez possessed the two cellular telephones. The discovery of the speakers, the subject of Mr. Pulido-Jacobo's receipt, in the trunk of a car in which he was riding confirmed his connection to the item and the documentation of its purchase. In this case, not only were the phones not in the possession of Mr. Vasquez, but his name was not on the bill and the registrants of the phones and the individuals who paid the bills were never identified. Even in *Jefferson*, the bearer of the document's name was inscribed on the bill. Because the facts fail to tie Mr. Vasquez to the receipts other than by possession, we conclude he did not adopt their contents and the district court erred by admitting the receipts into evidence.

The question remains whether the error was harmless. As previously noted, Mr. Vasquez objected to the admission of the receipts upon Rule 801 grounds, and not as a violation of his Sixth Amendment rights. "[W]here a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise the constitutional issue *sua sponte*." *United States v. Perez*, 989 F.2d 1574, 1582 (10th Cir.1993) (en banc). "To constitute plain error under the Confrontation Clause, the *constitutional* error must be (1) obvious, and (2) affect substantial rights" in a manner that "had an unfair prejudicial impact on the jury's deliberations." *Id.* at 1583(emphasis in the original). If we find there

-32-

is no plain error, we review the Rule 801 hearsay objection "under the nonconstitutional harmless error standard." *United States v. LaHue*, 261 F.3d 993, 1009 (10th Cir. 2001). "We will, however, apply the plain error rule less rigidly when reviewing a potential constitutional error. Furthermore, a closer scrutiny may also be appropriate when the failure to preserve the precise grounds for error is mitigated by an objection on related grounds." *Jefferson*, 925 F.2d at 1254 (quotation marks and citations omitted).

We first consider the nature of the receipts because it is relevant to Confrontation Clause analysis. The Supreme Court held in *Crawford v. Washington*, 541 U.S. 36 (2004), that the Confrontation Clause bars admission of testimonial out of court statements unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. *See id.* at 68. Although the Court did not precisely define "testimonial" in *Crawford*, we are certain that receipts from a private business transaction were not what the Court had in mind. *See id.* at 68 ("Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.").

We are therefore left to analyze nontestimonial statements, the receipts, to determine whether their admission violated the confrontation rights of Mr. Vasquez. We analyze such statements under the pre-*Crawford* rubric of *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), which requires "a showing of particularized

-33-

guarantees of trustworthiness." *See United States v. Saget*, 377 F.3d 223, 227 (2d. Cir. 2004) ("*Crawford* leaves the *Roberts* approach untouched with respect to nontestimonial statements"); *United States v. Franklin*, 415 F.3d 537, 546 (6th Cir. 2005) (same). In evaluating the trustworthiness of the receipts, we return to our analysis from *Jefferson*, where we said:

> The authenticity of the pager bill was not disputed. It was a bill from an established company that, on its face, gave every indicia of having been issued in the ordinary course of business. There was no indication that [Mr. Jefferson], who knew its contents, disputed the bill in any way. We need not, and do not, decide whether these factors establish the requisite "particularized guarantees of trustworthiness." However, we do hold that they are sufficient to prevent a conclusion that it was patently obvious that the introduction of the pager bill violated [Mr. Jefferson's] confrontation rights. . . Thus, it was not clear error for the district court to fail to exclude such evidence under the Confrontation Clause.

*Jefferson*, 925 F.2d at 1254-55. We find these conclusions persuasive in light of the facts in this case and conclude the constitutional error here was not obvious.

We therefore review the violation of the hearsay rules in this case for nonconstitutional harmless error. An error is not harmless if "it has a substantial influence on the outcome or leaves one in grave doubt as to whether it had such an effect." *United States v. Wacker*, 72 F.3d 1453, 1473 (10th Cir. 1995) (quotation marks omitted). The phone receipts were one among several pieces of evidence linking Mr. Vasquez to the conspiracy. Mr. Vasquez's phone conversations, the phone conversations of others regarding Mr. Vasquez's involvement, and the financial accounting sheets naming Mr. Vasquez in relation

-34-

to particular quantities of money and drugs paint a vivid picture of his involvement in drug trafficking without reliance on the phone receipts. Because of the abundance of other evidence, we are convinced the error was harmless.

### 4. Admissibility of Co-conspirator Statements

Mr. Vasquez contends the district court further erred by admitting recorded conversations into evidence as "co-conspirator statements" under Federal Rule of Evidence 801(d)(2)(E). He asserts the admission of this evidence impinged upon his Sixth Amendment confrontation rights as defined in *Bruton v. United States*, 391 U.S. 123 (1968), and *Crawford*.

As we have previously pointed out, "where a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise the constitutional issue *sua sponte*." *United States v. Solomon*, 399 F.3d 1231,1237-38 (10th Cir. 2005) (quoting *United States v. Perez*, 989 F.2d at 1582). At the pre-trial *James* hearing, Mr. Vasquez's counsel objected to the court's conclusion that the recorded statements were in furtherance of the conspiracy. *See* Ramirez Rec., supp vol. VI at 176-81. But Mr. Vasquez cites to no place in the record where he specifically asserted his confrontation rights or "repeatedly emphasiz[ed] his inability to cross examine" the declarants. *See United States v. Summers*, 414 F.3d 1287, 1297-98 n.7 (10th Cir. 2005). Consequently, we review the constitutional claim for plain error.

First, Mr. Vasquez argues the admission of transcribed phone conversations between co-conspirators ran afoul of the Supreme Court's holding in *Bruton*. Specifically, he disputes the admissibility of calls between Mr. Ramirez and Mr. Galaz-Felix while the later was incarcerated, in which the two parties appear to be discussing the debts due from Mr. Vasquez.[10] Mr. Vasquez's *Bruton* argument is unpersuasive, however, because "[e]vidence which is admissible under the conspiracy exception to the hearsay rule does not violate the right to confront and cross-examine guaranteed by the Sixth Amendment. The *Bruton* doctrine does not rule situations . . . in which the evidence is admissible under a well recognized exception to the hearsay rule." *United States v. Cox*, 449 F.2d 679, 688-89 (10th Cir. 1971). *See also Bourjaily v. United States*, 483 U.S. 171, 183-84 (1987). Mr. Vazquez does not dispute on appeal the admission of the phone conversations under Federal Rule of Evidence 801(d)(2)(E).[11] Ramirez Rec.,

---

[10]*See* Gov't Ex. 1R-T86 (Mr. Galaz-Felix says, "You have Chilango's number, right? . . . Tell him that the old stuff . . . Tell him he owes for the old stuff . . . and the yellowish kind . . . he was going take off the phone expenses and stuff."); Gov't Ex. 1R-T75 (Mr. Galaz-Felix says "I told Chilango that . . . two out of those four. Two for the thirteen point five and two for twelve and a half. I mean, and two for thirteen and five hundred . . . Because he owed the part for five hundred and . . . Two for thirteen and the other one for twelve.").

[11]"In order for statements to be admissible under Rule 801(d)(2)(E), the proponent of the evidence must establish, by a preponderance of the evidence, that: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made during the course of, and in furtherance of, the conspiracy." *United States v. Lahue*, 261 F.3d at 1008 (quoting *United States v. Williamson*, 53 F.3d 1500, 1517-18 (10th Cir.

(continued...)

supp. vol. VI at 178.

Second, Mr. Vasquez contends the co-conspirator statements satisfy the analytical scheme developed in *Crawford*, which bars testimonial out-of-court statements unless the witness is unavailable and the defendant had a prior opportunity to cross-examine. 541 U.S. at 68. In *Crawford*, the Court interpreted the primary concern of the Confrontation Clause as limiting the admission of "testimonial" hearsay. *See id.* at 51-53. Mr. Vasquez argues "the extra-judicial statements made by the co-defendants here . . . clearly qualifies [sic] as 'testimonial' and . . . are inadmissible against Mr. Vasquez under *Crawford*." Vasquez Br. at 18 n.17. We do not agree. Although the Supreme Court declined to precisely define "testimonial," *see Crawford*, 541 U.S. at 68, the Court explicitly noted that, historically, "statements in furtherance of a conspiracy" present an "example" of "statements that by their nature [a]re not testimonial."[12] *Id.* at 56. Moreover, the Court in *Crawford* cited *Bourjaily* with approval as one of several recent cases that "hew closely to the traditional line." *Crawford*, 541

_____

[11](...continued)
1995)).

[12]In *United States v. Faulkner*, 439 F.3d 1221, 1225 (10th Cir. 2006), we said the district court's conclusion that co-conspirator statements were not testimonial was "well-supported by *Crawford*." *Id.* Other circuits agree. *See United States v. Hansen,* 434 F.3d 92, 100 (1st Cir. 2006); *United States v. Martinez,* 430 F.3d 317, 329 (6th Cir. 2005); *United States v. Robinson,* 367 F.3d 278, 292 n. 20 (5th Cir. 2004); *United States v. Reyes*, 362 F.3d 536, 540 n.4 (8th Cir. 2004).

U.S. at 58. In *Bourjaily*, the Court held the Confrontation Clause did not require an independent inquiry into the reliability of statements properly admitted under Rule 801(d)(2)(E). *Bourjaily*, 483 U.S. at 183. Because *Crawford* did not overturn *Bourjaily*, the latter continues to control our application of the Confrontation Clause to Rule 801 co-conspirator statements.

In sum, the statements Mr. Vasquez asserts were wrongly admitted in this case were not testimonial, and thus do not present Confrontation Clause problems under *Crawford*. The statements at issue were admitted pursuant to Rule 801(d)(2)(E), and the district court did not violate Mr. Vasquez's right to confrontation by admitting the recorded phone conversations.


## SUFFICIENCY OF THE EVIDENCE CLAIMS

### 1. Mr. Lopez's Conviction for Possession with Intent to Distribute

Mr. Lopez contends the evidence presented at trial was insufficient to support his conviction for possession of the methamphetamine discovered at 1095 16th Street, Apartment Five. To sustain a conviction for possession with intent to distribute, the government must prove that "(1) the defendant possessed the controlled substance; (2) knew that he had it; and (3) possessed it with the intent to distribute it." *United States v. Pulido-Jacobo*, 377 F.3d at 1131 (quoting *United States v. Allen*, 235 F.3d 482, 492 (10th Cir. 2000)). Mr. Lopez disputes the sufficiency of the evidence demonstrating his knowing possession of the

methamphetamine. In evaluating whether the evidence is sufficient to support the jury's verdict, we "review the record de novo and ask only whether, taking the evidence-both direct and circumstantial, together with the reasonable inferences to be drawn therefrom-in the light most favorable to the government, a reasonable jury could find [Defendant] guilty beyond a reasonable doubt." *United States v. Jenkins*, 175 F.3d 1208, 1215 (10th Cir. 1999) (quoting *United States v. Voss*, 82 F.3d 1521, 1524-25 (10th Cir.)). We "evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997) (brackets and quotations marks omitted).

The government did not prove Mr. Lopez actually possessed the methamphetamine during or prior to the drug seizure. His conviction was founded instead on a demonstration of constructive possession. *See United States v. Carter*, 130 F.3d 1432, 1441 (10th Cir. 1997) ("Possession may be actual or constructive."). "[C]onstructive possession exists where the defendant has the power to exercise control or dominion over the item," *United States v. Lopez*, 372 F.3d 1207, 1212 (10th Cir. 2004), and "may be established by circumstantial evidence." *United States v. McKissick*, 204 F.3d 1282, 1291 (10th Cir. 2000). "With regard to narcotics, we have defined constructive possession as 'an appreciable ability to guide the destiny of the drug.'" *United States v. Culpepper*, 834 F.2d 879, 881 (10th Cir. 1987) (quotation marks omitted). Constructive

possession does not require exclusivity and may apply to multiple individuals. *Id.* at 882.

On appeal, Mr. Lopez focuses his insufficiency claim on the dearth of evidence connecting him to apartment five as of the date of the search. Having reviewed the record, we agree that the evidence presented at trial does not demonstrate Mr. Lopez was then a resident or had continuing broad dominion over the apartment.[13] However, the legally determinative relationship is not the one connecting Mr. Lopez to the apartment, but the relationship linking Mr. Lopez to the seized methamphetamine. As we recently declared, the "bedrock of constructive possession . . . is the *ability* to control the object," *United States v. Al-Rekabi*, 454 F3d 1113, 1120 (10th Cir. 2006), and not the relationship of the

_____

[13]Mr. Lopez was only tenuously connected to apartment five at the time the police discovered the drugs. He had not resided there for at least a month and a half prior to the discovery of the drugs. *See* Ramirez Rec., vol. XIII at 168 (Mr. Hurst stated [Mr. Lopez] "faded away . . . in the middle of November. . . [and] wasn't living [at the apartment]"); Ramirez Rec., vol. XIV at 7 (Mr. Lopez informed Mr Hurst he was living with his wife "somewhere out north."). Although a search of the apartment unearthed two bills addressed to Mr. Lopez at that address, one was a collection matter, and the other was for overdue charges. The search turned up three photographs of Mr. Lopez as well as a vehicle title in his name registered to the address. Two of the three photographs included Mr. Gaitan-Dominguez, the succeeding resident of the apartment. Although both bills demonstrate Mr. Lopez was *previously* a named bill-payer for the apartment, a fact neither party contests, neither bill provides evidence of his inhabitation at the time the drugs were discovered because they are for past services rendered. The other items found in the apartment only weakly, if at all, demonstrate Mr. Lopez's control over the apartment in January, as they may simply represent common detritus left behind upon his exit.

accused to the location where the object was discovered.[14] *See Lopez*, 372 F.3d at 1212 ("[C]onstructive possession exists where the defendant has the power to exercise control or dominion over the item. Control or dominion over the premises where the item is found is therefore a factor, but not a requirement, for finding constructive possession of the item itself.") (internal citations omitted). Based on the evidence described below, we conclude Mr. Lopez had sufficient *control over the drugs* to demonstrate constructive possession.

Phone calls made by Mr. Solis-Gaona and Mr. Gaitan-Dominguez following their arrests provide compelling evidence that Mr. Lopez exercised control over the drugs found in the apartment. *See* Gov't Ex. 1R-T1-3. After his arrest, Mr. Gaitan-Dominguez telephoned Ms. Murillo, with Mr. Lopez apparently listening in the background, *see id.*, on a recorded prison telephone line. Mr. Gaitan-Dominguez said "Hey, dude! It's just so [sic] can get those things out, as soon as you can and hurry up, do it fast, in every way. Don't stop for any reason." Gov't Ex. 1R-T1. Ms. Murillo, the speaker on Mr. Lopez' end, responded, impliedly in reference to Mr. Lopez, "He says that he agrees. He agrees, he says." *Id.* The prison phone system also recorded a conversation between Mr. Solis-Gaona and Ms. Murillo discussing the presence of drugs in the exercise machine at apartment

---

[14] Jury instructions explained constructive possession as "the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons." Ramirez Rec., vol. II, doc. 346, Jury Instruction 37, 54.

five and the need for the "guy . . . to take the things out of the house."  Gov't

Ex.1R-T2 at 2.[15]  In a third prison call involving Mr. Lopez, Mr. Gaitan-

Dominguez, and Ms. Murillo, Mr. Gaitan-Dominguez told Mr. Lopez, "Well,

move it, man, before they make this into a bigger deal," and Mr. Lopez responded

"I know, man."  Gov't Ex.1R-T3 at 3.

Although Mr. Gaitan-Dominguez and Mr. Solis-Gaona speak in vague

phrases, "this guy," "the things," "some stuff," a jury could reasonably infer that

in these calls Mr. Lopez committed to orchestrating the removal of drugs from

apartment five.  The callers discuss "some stuff" hidden in the "walking thing,"

and the need to "take them out from there." Gov't Ex. 1R-T2 at 2.  This

discussion refers euphemistically, but quite specifically, to the drugs hidden in the

exercise machine in apartment five.  Furthermore, statements like "get those

things out as soon as you can," "he's going to send someone there [to take the

---

[15] The call transcript reads:
[Mr. Solis-Gaona]: Tell this guy that's over here, to . . . to take the
things out of the house.
[Ms. Murillo]: Yeah, I already . . . I already told him.  He's going to
send someone there.
. . . .
[Mr. Solis-Gaona]: Did you tell him about . . . about the walking
thing?
[Ms. Murillo]: No.
[Mr. Solis-Gaona]: Didn't he tell you?.
[Ms. Murillo]: uh-uh
[Mr. Solis-Gaona]: But that guy already knows about . . . On that
walking thing there's . . .  down there, there's some stuff there, have
him take them out from there . . . .
Gov't. Ex. 1R-T2.

things out of the house]," and "move it, man," among others, demonstrate Mr. Lopez's ability to collect and then transfer the drugs from the apartment.

These phone conversations, and the reasonable inferences that can be drawn therefrom, when viewed, as we must, in a light most favorable to the government, support a finding that Mr. Lopez had the power to exercise control over the drugs. As the reasonable inferences that can be drawn from the phone calls meet the requirement of constructive possession, namely ability to control the contraband, *see Lopez*, 372 F.3d at 1212, we are untroubled by the failure of old bills and cast-off photographs to demonstrate Mr. Lopez possessed a generalized dominion over the apartment. We therefore conclude the evidence presented was sufficient to sustain Mr. Lopez's conviction for possession of methamphetamine with intent to distribute.

## 2. Evidence Supporting Conspiracy Convictions

Mr. Lopez, Mr. Mozqueda-Ramirez and Mr. Vasquez contend the government failed to prove they knowingly agreed to participate in a conspiracy. "To prove conspiracy, the government must show: (1) that two or more people agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged co-conspirators were interdependent." *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). The "government may establish these elements by direct or circumstantial evidence." *United States*

-43-

*v. Evans*, 970 F.2d 663, 668 (10th Cir. 1992). "When reviewing the jury's decision, we must view all of the evidence, both direct and circumstantial, in the light most favorable to the government, and all reasonable inferences and credibility choices must be made in support of the jury's verdict." *Id.* at 671 (quoting *United States v. Dickey*, 736 F.2d 571, 581 (10th Cir. 1984)).

We examine Mr. Lopez's claim first. He disputes that sufficient evidence was presented to demonstrate he agreed with others to violate the law. Such an agreement "need not be explicit, but rather may be inferred from the facts and circumstances of the case." *Id.* at 669. In this case, the facts from which a jury could infer an agreement include: (a) the storage unit rented in the name of Emilio Felix, Mr. Lopez's alias, containing paperwork in that name and sandwich bags, packing materials, a digital scale, and methamphetamine residue, *see* Ramirez Rec., vol. XIII at 120-124; (b) testimony from an Ogden City police officer that the "smell . . . and the wrapping" in the storage unit "was the same" as the wrapping for the drugs found in apartment five, *id.* at 123; (c) Mr. Gaitan-Dominguez's telephone conversation with Mr. Lopez, asking Mr. Lopez to "move it" after Mr. Gaitan-Dominguez was arrested in connection with drugs found in apartment five, Gov't Ex. 1R-T3 at 3; and (d) Mr. Lopez's recorded phone conversations with Mr. Ramirez discussing the transfer of money and drugs.[16]

_____

[16]*See, e.g.,* Gov't Ex. 1R-T37 at 7 (Mr. Lopez states "Every time I talk to [Mr. Galaz], he's just bringing out the money. Where the money is."); Gov't Ex.
(continued...)

Additional evidence connects an individual referred to by the conspirators as Julio, Jul, or Julia to the distribution of drugs. Mr. Lopez contends the record does not establish that the Julia or Julio appellations noted in phone calls and the drug ledger refer to him. Even assuming this is true,[17] the aforementioned evidence directly implicating Mr. Lopez is sufficient to establish an agreement. In this regard, we note that the storage unit was registered to Emilio Felix, an alias unambigously connected to Mr. Lopez, *see* Ramirez, Rec., vol. XIII at 159, 175 (Mr. Hurst identifies Mr. Lopez as Emilio Felix, the renter of apartment five,

---

[16](...continued)
1R-T46 at 3 (Mr. Ramirez asks Mr. Lopez, "Share some, can you?" Mr. Ramirez then tells Mr. Lopez, "[Topo] finished it off.," Mr. Lopez says, "like seven," and Mr. Ramirez responds, "Yeah, I've seen it." ); Gov't Ex. 1R-T60 at 5 (Mr. Ramirez says, "[Mr. Galaz] had it right in his house, can you believe that?" Lopez responds "Oh, really?" Ramirez replies, "He had a half, because he gave me another half, so I could store it for him); Gov't Ex. 1R-T69 at 7-8 (Mr. Ramirez asks "You still can't get anything for me, right?" Mr. Lopez responds "There ain't nothing, Deano. . . . Last night I . . . I called and no one has any . . . Jose told me that he has some.); Gov't Ex. 1-RT-74 at 3 (Mr. Lopez asks "What did he tell you?" Mr. Ramirez responds, "That you owed six . . . and [you] were gonna give it to him in two's."); *Id.* at 8 (discussing a police search of [Mr. Galaz's] basement, Mr. Lopez states "the guy bought a pick . . . in order to make a stash down there.").

[17]Contrary to Mr. Lopez's contention, at least one reference to "Julio" can be reasonably associated with him. In his brief, Mr. Lopez acknowledges he "help[ed] retain an attorney," Aplt. Br. at 37, for Mr. Gaitan-Dominguez and Mr. Solis-Gaona after their arrest. In Mr. Galaz's written financial accounting, he noted, "Julio took 10 thousand for the lawyer." Gov't Ex. 1R-24(g). A juror could reasonably infer that Mr. Lopez's involvement in retaining an attorney and the ledger's reference to a "Julio" taking money for a lawyer describe the same person and action. Although this entry alone does not prove all references to Julio pertain to Mr. Lopez, the listing of Mr. Lopez, even once, in the ledger supports a conclusion that he was part of the criminal enterprise.

-45-

and testifies that Mr. Lopez admitted he was both Mr. Lopez and Mr. Felix), and Mr. Lopez discussed in numerous phone calls with Mr. Ramirez what a juror could reasonably conclude was the trafficking of drugs. None of this evidence required the jury to conclude an offhand reference to an individual by the shortened or feminine form of Julio was in fact Mr. Lopez. There is sufficient evidence linking Mr. Lopez to the conspiracy even without considering evidence referencing Julio, Julia, or Juliana.

Similarly, Mr. Mozqueda-Ramirez argues there was insufficient evidence linking him to the conspiracy. He asserts the evidence connecting him to the conspiracy consisted solely of phone calls between him and Mr. Aparicio in which he made "innocuous statements regarding a white Camaro or a Brave One." Mozqueda-Ramirez Br. at 21. He contends that the "reference to a white Camaro could have been just that, a white Camaro and not drugs," *id.* at 20, and that a "Brave One" could represent a "saying that means something to Hispanics" unrelated to drugs. *Id.* at 21. If those references were the whole of Mr. Mozqueda-Ramirez's statements, we might be inclined to rule in his favor, but his conversations included numerous additional alleged coded references to drugs and money,[18] in a context demonstrating his involvement in distribution.[19] The

---

[18]*See, e.g.,* Gov't Ex. 4A-T5 "a quarter," "tickets," "small room of a hotel," "the other animal," "windows," "ice," "little eight," and "a Seven Eleven"); Gov't ex. 4A-T11 ("that stuff," "a ball," "a notebook"); Gov't ex. 4A-18 ("material," "the brave one," "white paint"); Ramirez Rec., vol. XIV at 46-47

(continued...)

extensive recorded dialogue between Mr. Mozqueda-Ramirez and Mr. Aparicio, containing what a jury could reasonably conclude was coded language relating to drug distribution, is sufficient to support Mr. Mozqueda-Ramirez's conspiracy conviction.

Mr. Vasquez makes similar claims as to the sufficiency of the evidence to support his conspiracy conviction. Previously, we concluded the cellular phone receipts found on Mr. Vasquez when he was arrested were mistakenly admitted into evidence at trial. Even without the aid of the receipts, however, a reasonable jury could find Mr. Vasquez guilty of conspiracy beyond a reasonable doubt. Wiretap recordings capture Mr. Vasquez directly conversing about drugs or, more precisely, terms a reasonable jury could conclude refer to drugs and drug dealing.

---

[18](...continued)
(Agent Barrett's testified the term "[h]otel [represents] the pound quantity, a room being a quarter pound, and a quarter of that, or the small room, would be a quarter of the quarter" and "from my own experience . . . windows is a common term for crystal methamphetamine.").

[19]*See, e.g.,* Gov't. Ex. 4A-T5 (In a phone call involving Mr Aparicio and Mr. Mozqueda-Ramirez, Mr. Aparicio says "I just wanted to see if you could get me a small room of a hotel," and "I want to be sure that you can get it." Mr. Mozqueda-Ramirez later says "I've got some but it's just three or four little ones. I've got them ready"); Gov't. Ex. 4A-T11 (In a phone call involving Mr Aparicio and Mr. Mozqueda-Ramirez, Mr. Aparicio says "There's this guy that wants . . . a ball . . . and there was another guy up there that wanted a whole notebook . . . . But I don't know if you would be able to lend me the whole notebook for two days."); Gov't Ex. 4A-T18 (In a phone call involving Mr Aparicio and Mr. Mozqueda-Ramirez, Mr. Mozqueda-Ramirez says he is "over here on the streets already," Mr. Aparicio asks "How are you doing on material?" and Mr. Mozqueda-Ramirez responds by asking "which kind? the brave one . . . the white paint?").

For example, Mr. Vasquez and Mr. Aparicio engaged in the following recorded

conversation:

> [Jose Aparicio]: . . . do you have any material.
> [Vasquez]: . . . the only thing I have left are donuts.
> [Jose Aparicio]: No, no problem, I only need a quarter, a hotel.
> [Vasquez]: oh.
> [Jose Aparicio]: With the money on hand.

Gov't Ex. 4A-T7. Although the government failed to establish "donuts" had a

drug-related meaning, *see* Ramirez Rec., vol. XIV at 50, it did provide the jury

with specific secondary drug-related definitions for the terms "hotel" and

"quarter." *See id.* at 46.

Furthermore, numerous references to Mr. Vasquez, by his given name or by

his nickname, Chilango,[20] in other recorded wiretap conversations indicate his

involvement in drug trafficking.[21] Furthermore, Mr. Galaz-Felix 's ledger

---

[20]Notably, Mr. Vasquez self-identified as Chilango in a recorded call with Mr. Ramirez. *See* Gov't Ex. 1R-T66 (Mr. Ramirez asks, "Who is this?" and Mr. Vasquez responds, "This is Chilango, man"); Gov't Ex. 2, # 93 (authenticating Mr. Vasquez as speaker on above call).

[21]*See* Gov't Ex. 1R-T6 ( Jose Aparicio tells Carlos Aparicio, "It was a half ounce that belonged to Chilango." Carlos Aparicio later says, "I just called Chila a little while ago, to tell him that I wanted, but he says he doesn't have anything left . . . . It's just that when I get some, I tell Chila."); Gov't Ex. 1R-T86 (Mr. Galaz-Felix says to Mr. Ramirez, "You have Chilango's number, right? . . . Tell him that the old stuff . . . Tell him he owes for the old stuff . . . and the yellowish kind . . . he was going take off the phone expenses and stuff."); Gov't Ex. 1R-T66 (Mr. Vasquez discusses Mr. Galaz-Felix's arrest with Mr. Ramirez, "He asked me to call you . . . . They got him with just the tickets, right?"); Gov't Ex. 1R-T75 (Mr. Galaz-Felix says to Mr. Ramirez "I told Chilango that . . . two out of those four. Two for the thirteen point five and two for twelve and a half. I mean,

(continued...)

-48-

includes a number of entries for "Vasquez" and variations of the nickname Chilango accompanied by references to money and items and quantities that could be interpreted as drug related euphemisms. Taking this evidence together with the reasonable inferences to be drawn therefrom in the light most favorable to the government, we conclude a reasonable jury could find Mr. Vasquez guilty of conspiracy beyond a reasonable doubt.

## TRIAL COUNSEL ISSUES

### 1. Claim of Ineffective Assistance of Mr. Mozqueda-Ramirez's Counsel

Mr. Mozqueda-Ramirez argues his original trial counsel was ineffective for failing to file pre-trial motions or join the motions of other defendants and for failing to recognize a conflict of interest earlier in the trial process. As we have previously noted, however, "[i]neffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal. Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed." *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995). *See also Massaro v. United States*, 588 U.S. 500, 504 (2003). Accordingly, we dismiss

---

[21](...continued)
and two for thirteen and five hundred . . . . Because he owed the part for five hundred and . . . Two for thirteen and the other one for twelve."); Gov't Ex. 1R-T56 (Mr. Galaz-Feliz tells Mr. Ramirez that "Chilango called me . . . I told him to drop by . . . to take it over to you. . . so just keep it there for me and I'll pick it up." during a conversation about stashing drugs).

Mr. Mozqueda-Ramirez's present ineffectiveness claim. He may reassert this claim in future collateral proceedings.

**2. Denial of Motion for Withdrawal of Mr. Mozqueda-Ramirez's Counsel**

Mr. Mozqueda-Ramirez asserts the district court erred in denying his attorney's motion to withdraw as counsel. *See* Mozqueda-Ramirez Rec., vol. II at 163. We review the denial of such a motion for an abuse of discretion. *See United States v. Johnson*, 961 F.2d 1488, 1490 (10th Cir. 1992). "To warrant a substitution of counsel, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *United States v. Porter*, 405 F.3d 1136, 1140 (10th Cir. 2005) (quotation marks omitted). In his brief, Mr. Mozqueda-Ramirez restates his ineffectiveness claim, discussing the difficulties encountered by counsel in preparing for trial in a limited time frame and the "scant"ness of evidence proving his involvement in the conspiracy, essentially reiterating his sufficiency arguments. He does not demonstrate good cause for removal of counsel as defined in *Porter*. Our independent review of the March 2, 2004 motion hearing before the magistrate judge does not convince us of the existence of a complete breakdown in the attorney-client relationship. *See* Ramirez Rec., sup. vol. VII at 9 (Mr. Mozqueda-Ramirez explaining to the magistrate judge, "I just want to switch attorneys."). We are not persuaded the district court abused its discretion in denying Mr. Mozqueda-Ramirez's request

for withdrawal of his attorney.


## SENTENCING ISSUES

### 1. Application of Mandatory Minimum

The district court sentenced Mr. Mozqueda-Ramirez to 151 months imprisonment, followed by five years of supervised release, in accordance with the lower end of the recommended guidelines range. *See* Rec., vol. XI at 16. Mr. Mozqueda-Ramirez now asserts "the trial judge erred by imposing minimum mandatory sentencing in light of . . . *Blakely* . . . and . . . *Booker.*" Mozqueda-Ramirez. Br. at 25. In doing so, he fails to cite facts in the trial record or *post-Booker* case law from the Tenth Circuit to clarify and support his claim. As best as we can decipher, a statutory minimum mandatory sentence of five years was required on Mr. Mozqueda-Ramirez's conviction for conspiracy to distribute controlled substances, and Mr. Mozqueda-Ramirez's argument is that the application of a mandatory minimum violated his Sixth Amendment right to a jury trial. We have held, however, that *United States v. Booker*, 543 U.S. 125 (2005), "does not apply to statutory minimum sentences." *United States v. Harris*, 447 F.3d 1300, 1307 (10th Cir. 2006). Consequently, although we cannot tell from the provided record how the minimum mandatory on one count factored into his total guideline range, the court did not err in sentencing him to the extent that the sentence incorporated a mandatory minimum required by statute.

**2. Sentencing of Mr. Ramirez**

Mr. Ramirez contends the district court erred by imposing a sentence based on facts not proven beyond a reasonable doubt or admitted by him, in violation of *Booker* and its antecedents. Specifically, he argues the district court committed a constitutional *Booker* error by relying on evidence not proven to the jury to establish his possession of a gun, his use of a minor, and his leader status. *See United States v. Gonzalez-Huerta*, 403 F.3d 727, 731 (10th Cir. 2005).

The Probation Office, in drafting Mr. Ramirez's presentence report ("PSR"), originally assigned a base offense level of 38. At Mr. Ramirez's sentencing hearing, the district court rejected the PSR's recommendation and instead assigned a base level of 32 to account for a lower drug quantity. *See* Ramirez Rec., vol. XXI at 19. The court supplemented the base level of 32 with 4 additional levels for being a leader, 2 for possession of a gun, and 2 for the use of a minor to commit an offense. Mr. Ramirez's offense level then totaled 40, which led to a recommended range of 360 months to life when combined with his criminal history category of IV. The court noted it did "not believe that [18 U.S.C. §] 3553 requires a life sentence." *Id.* at 4. Before determining Mr. Ramirez's actual sentence, the court "recognize[d], as we all do now, [the Sentencing Guidelines] are not mandatory. They are a factor." *Id.* at 26. *See also id.* at 4 ("I'm not bound by the guidelines."). The court then sentenced Mr. Ramirez to 30 years imprisonment and 5 years of supervised release.

The type of constitutional error Mr. Ramirez asserts does not apply here because the district court did not apply the guidelines as mandatory. "[C]onstitutional [*Booker*] error . . . occurs *when the district court applies the Guidelines in a mandatory fashion*, makes factual findings (other than the fact of prior convictions), *and* imposes a sentence above the maximum that would apply in the absence of such findings." *United States v. Yazzie*, 407 F.3d 1139, 144 (10th Cir. 2005) (emphasis added). As the Supreme Court itself indicated in *Booker,*

> [i]f the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range.

543 U.S. at 233. The remedy in *Booker* established an advisory scheme, and the district court in this case properly contemplated the guideline recommendations as a non-binding factor. There was no "constitutional *Booker* error" as it was defined in *Yazzie* and *Gonzalez-Huerta*.

After *Booker*, the fixed statutory maximum and not the discretionary guidelines range establishes the "maximum" for purposes of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *See United States v. Crockett*, 435 F.3d 1305, 1319 (10th Cir. 2006). Only if Mr. Ramirez's sentence exceeded the statutory

maximum, which in this case was life imprisonment,[22] would he have a potentially

cognizable *Apprendi* argument.  The district court's use of sentencing

enhancements did not violate Mr. Ramirez's Sixth Amendment rights.

Mr. Ramirez also contends 21 U.S.C. §§ 841 and 846  are void for

vagueness because the guideline sentencing factors were not defined by statute as

elements of the crimes or charged in the indictment.  Mr. Ramirez concedes he

"had sufficient notice to know that conspiring to distribute 500 grams or more of

a mixture containing methamphetamine was unlawful conduct," but he asserts he

"could not have known that he would be subject to criminal liability for his role

in the offense or relevant conduct" recognized by sentencing enhancements.

Ramirez. Br. at 17.

The Sentencing Guidelines provide that "[c]onduct that is not formally

charged or is not an element of the offense of conviction may enter into the

determination of the applicable guideline sentencing range."  U.S.S.G. § 1B1.3,

backg'd, and the Supreme Court has said sentencing courts "may exercise[]

discretion . . . in imposing sentence *within statutory limits* in the individual case."

*Apprendi*, 530 U.S. at 481(emphasis in the original).  *See also Booker*, 543 U.S. at

---

[22] *See* 21 U.S.C. § 841(1)(A)(viii) ("In the case of a violation . . . involving . . . 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine . . . such person *shall be sentenced to a term of imprisonment which may not be . . . more than life*.") (emphasis added); 21 U.S.C. § 846 ("Any person who  . . . conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense.").

233. Where the guidelines are merely advisory, as they were at the time of Mr. Ramirez's sentencing, the maximum sentence is the statutory limit, not the upper bound of the calculated guidelines range.

Mr. Ramirez's only conviction was for violating § 841 and § 846, the content of which he concedes he had sufficient notice. "The evidence produced at trial demonstrates that [the defendant] had knowledge of the illegality of his activities, and thus this is not a situation where he could not reasonably understand that his contemplated conduct is proscribed." *United States v. Day,* 223 F.3d 1225, 1229 (10th Cir. 2000) (internal quotation marks omitted). The district court here exercised its discretion to arrive at a carefully considered sentence that fell within the statutory range. The sentencing enhancements were not required to be included in the statute as elements of the crime because they were properly within the court's discretion at sentencing. We will not deem the statute vague due to their absence.

## CONCLUSION

We **AFFIRM** the convictions and sentences of all defendants.