PUBLISH

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**March 6, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MARIO FAULKNER,

Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTONYO LADARRELL RODGERS,

Defendant - Appellant

No. 05-3061

No. 05-3073

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 03-CR-20191-01-JWL) and**
**(D.C. NO. 03-CR-20191-03-JWL)**

Theodore J. Lickteig, Law Offices of Theodore J. Lickteig, Overland Park, Kansas, for the Defendant - Appellant, Mario Faulkner.

Stephen B. Chapman, Chapman & White, LLC, Olathe, Kansas, for the Defendant - Appellant, Antonyo Ladarrell Rodgers.

Terra D. Morehead, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with her on the brief), Kansas City, Kansas, for Plaintiffs-Appellees.

Before **TACHA** , Chief Judge,  **ANDERSON** , and **HARTZ** , Circuit Judges.

**HARTZ** , Circuit Judge.

Mario Faulkner, Antonyo Ladarrell Rodgers, and Maurice Anthony Peters were charged in the United States District Court for the District of Kansas in a two-count indictment with attempt (Count 1) and conspiracy (Count 2) to murder Shedrick Kimbrel to prevent him from testifying in the federal kidnapping trial of Demetrius R. Hargrove.  *See* 18 U.S.C. §§ 371, 1512(a).  Peters pleaded guilty to Count 2 and agreed to cooperate with the prosecution.  Mr. Faulkner and Mr. Rodgers (Appellants) went to trial.  At the close of the evidence, the district court granted their motion to dismiss Count 1.  The jury found them guilty on Count 2.

Before trial Appellants moved to suppress recordings of five telephone conversations between Hargrove and others (including themselves) while he was detained pending trial at the Corrections Corporation of America facility in Leavenworth, Kansas (CCA).  They argued that the recorded conversations should be excluded from evidence under the Federal Wiretap Act, 18 U.S.C. § 2510 *et seq.*  The district court held that the recordings were admissible under the

"consent" exception in the Act. *See* 18 U.S.C. § 2511(2)(c)-(d). Appellants also filed a motion in limine arguing that admission of the conversations would violate the Confrontation Clause of the United States Constitution. U.S. Const. amend. VI. The district court ruled that the statements were not testimonial and therefore were not barred by the Confrontation Clause. During trial the court found that the tapes were properly authenticated and allowed them in as statements in furtherance of a conspiracy. On appeal Appellants contend that the district court erred in its rulings under the Wiretap Act and the Confrontation Clause. We affirm.

## I.     FACTUAL BACKGROUND

CCA is a privately operated prison which houses pretrial detainees under a contract with the United States Marshals Service. Upon arrival at CCA, detainees receive an orientation manual which states, among other things, that the "[t]elephones are subject to recording and monitoring." R. Vol. Five at 10. In addition, detainees are told during orientation that their calls "could be" recorded, *id*. at 11, they receive an inmate handbook which states that "[t]elephone conversations may be monitored and/or recorded for security reasons," *id*. at 13, and signs posted over each of the general-population phones announce that calls are subject to monitoring, *id*. at 14. Moreover, it appears that when a call is

placed from CCA, a recorded voice states, "This call is subject to monitoring and recording." *Id*. at 23-24. All telephone calls are, in fact, recorded.

It was from these prison phones that Hargrove made calls and spoke with Appellants to conspire to murder Shedrick Kimbrel. The calls were monitored and recorded by CCA, and five of these calls were admitted as evidence at trial.

## II. FEDERAL WIRETAP ACT

The Federal Wiretap Act "generally forbids the intentional interception of wire communications, such as telephone calls, when done without court-ordered authorization." *United States v. Workman*, 80 F.3d 688, 692 (2d Cir. 1996). "It protects an individual from all forms of wiretapping except when the statute specifically provides otherwise." *United States v. Hammond*, 286 F.3d 189, 192 (4th Cir. 2002) (internal quotation marks omitted).

When information is obtained in violation of the Act, "no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial." 18 U.S.C. § 2515. But only an "aggrieved person . . . may move to suppress" a communication that was "unlawfully intercepted." *Id*. § 2518(10)(a); *see Alderman v. United States*, 394 U.S. 165, 175 & n.9 (1969) (Congress could have excluded such evidence "against anyone for any purpose" but "has not done so. . . . Congress has provided only that an 'aggrieved person' may move to suppress . . . a . . . communication intercepted in

-4-

violation of the Act.").  An "aggrieved person" is defined by the Act as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).  This standing requirement "should be construed in accordance with existent standing rules."  *Alderman*, 394 U.S. at 176 n.9.  Generally, to establish standing the movant must show that (1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises.  *See United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990).  Of the five intercepted communications that were admitted at trial, Mr. Faulkner was a party to two and Mr. Rodgers was a party to another.  On the record before us it does not appear that either has standing to challenge admission of any of the intercepted communications they were not parties to.  Nevertheless, the government has not raised the issue, so we need not address it.  *See United States v. Dewitt*, 946 F.2d 1497, 1499 (10th Cir. 1991) (standing issue waived when not raised by government).

The government does not dispute that the Act applies to prisons.  *See Hammond*, 286 F.3d at 192; *United States v. Feekes*, 879 F.2d 1562, 1565 (7th Cir. 1989); *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987).  To justify the challenged interceptions, the government relies on the "law enforcement" exception, 18 U.S.C. § 2510(5)(a)(ii) (definition of *interception* excludes

recording made by "any telephone . . . instrument, equipment or facility . . . being used by . . . an investigative or law enforcement officer in the ordinary course of his duties"), and the "consent" exception, *id*. § 2511(2)(d). The district court rejected the law-enforcement exception because there was no evidence that CCA officials had been granted law-enforcement authority by the Marshals Service. *See id*. § 2510(7) (defining *investigative or law enforcement officer* as one who is "empowered by law to conduct investigations of or to make arrests for" violations of Chapter 18 of the United States Code). But it ruled that the consent exception applied. Because we hold that the recordings were properly admitted under the consent exception, we need not resolve whether they might also have been admissible under the law-enforcement exception.

The consent exception provides:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

*Id*. § 2511(2)(d). (Section 2511(2)(c) provides the same exception for persons acting under color of law except that the "unless" clause is omitted.) It is generally accepted that a prisoner who places a call from an institutional phone with knowledge that the call is subject to being recorded has impliedly consented

-6-

to the recording.  *See United States v. Footman*, 215 F.3d 145, 154 (1st Cir. 2000); *Amen*, 831 F.2d at 378-79 (2d Cir.); *Hammond*, 286 F.3d at 192 (4th Cir.); *United States v. Horr*, 963 F.2d 1124, 1126 (8th Cir. 1992); *United States v. Van Poyck*, 77 F.3d 285, 292 (9th Cir. 1996).  The only circuit opinion to question this application of the consent exception is *Feekes*, 879 F.2d 1562.  In that opinion the Seventh Circuit upheld the recording of prisoners' conversations under the law-enforcement exception to the Wiretap Act but added the following dictum in response to the contention that the consent exception applied because the prisoners had been notified that their calls would be monitored:

> To take a risk is not the same thing as to consent.  The implication of the argument is that since wiretapping is known to be a widely employed investigative tool, anyone suspected of criminal (particularly drug) activity who uses a phone consents to have his phone tapped—particularly if he speaks in code, thereby manifesting an awareness of the risk.

*Id*. at 1565.

We are not persuaded to depart from the unanimous view of the *holdings* by our fellow circuit courts.  The issue is solely one of statutory interpretation.  The Second Circuit observed that "[t]he legislative history shows that Congress intended the consent requirement [exception?] to be construed broadly," *Amen*, 831 F.2d at 378, noting in support that the Senate Report on the Wiretap Act said of the consent exception: "'Consent may be expressed or implied.  Surveillance devices in banks or apartment houses for institutional or personal protection

would be impliedly consented to.'" *Id*. (quoting S. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. Code Cong. & Admin.News 2112, 2182). Of course, there is a difference between *broad* and *unlimited*. We agree with *Feekes* that engaging in drug trafficking does not in itself imply consent to a wiretap. But that is not this case. We are dealing here with incarcerated persons who receive very specific warnings about particular phones. To be sure, the prisoners at CCA did not have the opportunity to choose another, unmonitored telephone. But loss of some choice is a necessary consequence of being confined, and "[p]rison inmates have few expectations of privacy in their communications." *Footman*, 215 F.3d at 155. Rarely are choices in life totally free from opportunity costs; something must be foregone whenever one comes to a fork in the road. The real issue is whether imposition of a condition is acceptable, so that a choice subject to that condition is considered a voluntary, consensual one. *See Brady v. United States*, 397 U.S. 742, 749-52 (1970) (guilty plea was voluntary even though entered to avoid threat of death penalty). Because of the undeniable need to control prisoner communications to the outside world, we have no hesitation in concluding that a prisoner's knowing choice to use a monitored phone is a legitimate "consent" under the Wiretap Act.

In this case Hargrove impliedly consented to recording of the conversations. As previously noted, detainees at CCA receive numerous warnings

that their calls may be recorded. Hargrove was undoubtedly well aware of these warnings; during a conversation with Mr. Rodgers he said, "I can't hardly talk on this phone, cause you know they got it screened. . . . [They] got this phone tapped so I gotta be careful." R. Vol. Four, Gov. Ex. 13 at 14. (The coded language used by Appellants indicates that they too were aware that the calls were being monitored.)

Appellants complain that they were not the ones who answered the calls placed by Hargrove and they did not hear the recorded voice. But this is irrelevant because the consent of one party is enough, *Footman*, 215 F.3d at 154 ("It is settled law that only one party need consent to the interception of the calls."), and Hargrove consented. The district court therefore properly held that the consent exception applied and the conversations were not excludable under the Wiretap Act.

## III.  CONFRONTATION CLAUSE

Appellants also contend that admission of the recorded conversations violated the Confrontation Clause of the United States Constitution because Hargrove did not take the stand and there was no chance to cross-examine him. The Clause guarantees a criminal defendant "the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

The district court relied on *Crawford v. Washington*, 541 U.S. 36 (2004), to hold that the Confrontation Clause would not be violated by admission of the taped conversations. *Crawford* held that the Clause bars the admission of "testimonial" hearsay unless (1) the declarant testifies at trial, *id*. at 59 n.9, or (2) the declarant is unavailable to testify and was previously subject to cross-examination concerning the statement, *id*. at 59. Although *Crawford* did not define *testimonial* precisely, *id.* at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"), it said that the term encompasses formal statements to government officers, including at least statements during police interrogation and prior testimony, *see id*. at 51-52, 68; *see also United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005) ("[W]e hold that a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime."). The district court in this case ruled that the recorded statements were not testimonial, a conclusion well-supported by *Crawford*. *See* 541 U.S. at 56 ("statements in furtherance of a conspiracy" are examples of "statements that by their nature [are] not testimonial"). *Crawford* left open, however, whether the Confrontation Clause applies to nontestimonial hearsay. *See id*. at 53 (stating that testimonial hearsay is primary object of the Sixth Amendment, "even if the Sixth Amendment is not solely

concerned with testimonial hearsay"); 61 ("we need not definitively resolve whether [the rejection in *White v. Illinois*, 502 U.S. 346, 352-53 (1992), of the proposition that the Confrontation Clause applies only to testimonial statements] survives our decision today.").

Thus, in this opinion we could engage in speculation regarding the scope of the Confrontation Clause after *Crawford*. But that is unnecessary. One thing that is clear from *Crawford* is that the Clause has no role unless the challenged out-of-court statement is offered for the truth of the matter asserted in the statement. *Crawford* states: "The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. at 60 n.9. And the only nontestimonial statements that it considers to be possible subjects of the Clause are "nontestimonial *hearsay*." *Id*. at 68 (emphasis added); *see id*. at 60 (to extent Confrontation Clause covers more than testimonial statements, its subject is hearsay). In other words, the Clause restricts only statements meeting the traditional definition of hearsay. *See generally* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").[1]

---

[1]The Federal Rules of Evidence do not treat declarations by conconspirators as an exception to the hearsay rule but as nonhearsay. *See* Fed. R. Evid. 801(d)(2)(E) ("A statement is not hearsay if . . . . [t]he statement is offered against a party and is . . . a

(continued...)

-11-

At Appellants' trial the only statements by Hargrove offered into evidence were not offered for the truth of any assertions he made. This is hardly unusual in conspiracy cases, but the point is often, even generally, overlooked. Statements by coconspirators are commonly introduced at trial simply because the statements themselves are part of the plotting to commit a crime. The coconspirator is not asserting the truth of a historical event. Rather, he is directing the conduct of a fellow conspirator or agreeing to follow directions. Even statements about historical events—such as an assertion that the targeted victim had shot a member of the gang plotting revenge—typically are not offered for their truth; whether the target actually committed the alleged offense is irrelevant to the guilt of the plotters.

As explained in the Advisory Committee Notes to Fed. R. Evid. 801, "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not

---

[1](...continued)
statement by a conconspirator of a party during the course and in furtherance of the conspiracy."). The explanation for this nomenclature is that the rationale for the admissibility of these (and other statements categorized as "admissions") is that "their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule." Fed. R. Evid. 801 advisory committee notes on 1972 proposed rules. This explanation, however, does not change the Confrontation Clause analysis; the Supreme Court consistently refers to the admissibility of "statements in furtherance of a conspiracy" as a "hearsay exception[ ]." *Crawford*, 541 U.S. at 56; *see Bourjaily v. United States*, 483 U.S. 171 (1987) (repeatedly referring to coconspirator statements as hearsay).

hearsay. . . .  The effect is to exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights."  Fed. R. Evid. 801 advisory committee's note to subdivision (c).  Thus, Professor Mueller writes:

> [C]oconspirator statements are sometimes hearsay, and sometimes not.  In the trial of Thomas Hardy in 1794, Chief Justice Eyre offered the simplest illustration of this point: If three persons are prosecuted for conspiracy, the conversation in which they plan the venture and agree to participate is not hearsay, and the words spoken by each may be proved against all, but a later statement by one of them admitting his involvement would be hearsay if offered against the others to prove that point.

Christopher B. Mueller, *The Federal Coconspirator Exception: Action, Assertion, and Hearsay*, 12 Hofstra L. Rev. 323, 326 (1984); *see, e.g.*, *United States v. Lim*, 984 F.2d 331, 336 (9th Cir. 1993) (statements between defendant and unindicted coconspirator are "not hearsay; they are verbal acts admissible to show that a conspiratorial agreement existed"); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1075 (2d Cir. 1988) (same); *United States v. Miller*, 771 F.2d 1219, 1233 (9th Cir. 1985) (unnecessary to consider whether certain testimony "was admissible as a co-conspirator statement or whether it violated appellants' confrontation rights" because statements not offered for their truth; "their significance lies solely in the fact that [the coconspirators] made them"); *United States v. Hamilton*, 689 F.2d 1262, 1270 n.4 (6th Cir. 1982) (orders placed for

-13-

explosives on behalf of conspiracy were not hearsay but "verbal acts . . . unaffected by the coconspirator rule"); *United States v. Burke*, 495 F.2d 1226, 1232 (5th Cir. 1974) ("These statements, rather than hearsay, . . . were 'verbal acts,' statements which were elements of the crime charged.").

Appellants have not pointed to any of Hargrove's statements as having been offered for the truth of what he was asserting. Accordingly, their Confrontation Clause challenge must fail.

## IV. CONCLUSION

We AFFIRM the judgment below.