**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 19, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

FIDENCIO VERDIN-GARCIA
and MIGUEL ROMERO,

Defendants-Appellants.

No. 06-3354

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 05-CR-20017-JWL)**

---

Theodore J. Lickteig, Overland Park, Kansas, for Defendant Appellant Fidencio
Verdin-Garcia; Linda Mary Neal, Overland Park, Kansas, for Defendant-
Appellant Miguel Romero.

Sheri McCracken, Assistant United States Attorney (Eric F. Melgren, United
States Attorney, with her on the brief), Kansas City, Kansas, for Plaintiff-
Appellee.

---

Before **HARTZ**, **McCONNELL**, and **HOLMES**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Fidencio Verdin-Garcia and Miguel Romero were convicted on March 21, 2006, of multiple crimes relating to their leadership of a large marijuana and methamphetamine trafficking conspiracy located in and around Kansas City, Kansas. Each was sentenced to serve three concurrent life sentences in prison, and to other, shorter concurrent sentences. They appeal, and we now affirm.

## I. BACKGROUND

We take the evidence from Appellants' trial, as we must, in the light most favorable to the government. That evidence showed that Appellants are illegal immigrants from Nayarit, a western state in Mexico. With a number of family members they moved to Kansas City, where, as time went by, they abandoned odd jobs to focus on careers in drug dealing. Specifically, Mr. Verdin-Garcia and Mr. Romero directed the importation of large quantities of marijuana and methamphetamine, including "ice," from California, and they distributed the drugs principally in Kansas City, Kansas, and Kansas City, Missouri. In September 2003 the Federal Drug Enforcement Administration (DEA) began an investigation of Appellants' California affiliate, the Carra organization. This led them to Kansas, where in January 2004 they and the Kansas DEA opened an investigation into the Verdin-Garcia organization.

That investigation lasted approximately ten months. The DEA conducted extensive surveillance of nine residences in the Kansas City area out of which elements of the Verdin-Garcia organization operated, and identified over a dozen

-2-

of its members. To gather additional intelligence on the structure and operations of the conspiracy, the DEA sought and obtained warrants for wiretaps of three cellular phones used by, among others, Mr. Verdin-Garcia and Mr. Romero. During the period of August 16 to November 2, 2004, law enforcement agents intercepted some 3000 telephone calls under these wiretaps, which they used to piece together many of the specifics of the organization's drug buys and sales, money transfers, and internal structure.

On September 29, 2004, co-conspirator Gustavo Castro was arrested with one pound of methamphetamine. On October 31, co-conspirator Arturo Zuniga was arrested with four ounces of methamphetamine. The next day, November 1, police arrested co-conspirators Victor Lemus-Cruz, Juan Carlos Avina, and Jose Insunza-Flores with half a pound of methamphetamine and two of the wiretapped phones in their possession. Before police could stop him, Mr. Avina called Mr. Verdin-Garcia to warn him of the bust. Within hours, police apprehended Appellants fleeing from Mr. Romero's home. Searches of the conspirators' residences turned up scales, a vacuum sealer, money, and additional methamphetamine packaged for sale.

On February 4, 2005, Appellants were indicted on multiple charges of conspiracy, possession, and distribution of methamphetamine, and use of a communications facility to facilitate the commission of a drug felony. Mr. Romero was also charged with possession of a firearm by a felon, based on a

9mm handgun found in his home.  After a ten-day trial, they were found guilty by a jury on March 21, 2006.  Mr. Verdin-Garcia was convicted on fourteen counts and Mr. Romero on six.  Mr. Verdin-Garcia was subsequently sentenced to three terms of life imprisonment and eleven terms of four years' imprisonment.  Mr. Romero was sentenced to three terms of life imprisonment, one of ten years, and two of four years.  They timely appealed.

## II.  DISCUSSION

Appellants bring three challenges to their convictions.  They argue (1) that the wiretaps carried out during the investigation were invalid and wiretap-recorded evidence should have been excluded from their trial, (2) that translations of wiretapped conversations were improper and should have been excluded, and (3) that Mr. Verdin-Garcia's telephone calls made from prison after his arrest in this case were improperly recorded for use as voice exemplars and that derivative evidence should have been excluded.  They also challenge their sentences, asserting both that they were incorrectly calculated and that the life terms are unreasonably long.

### A.  Wiretap Warrants

Federal investigatory wiretaps are governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–22.  Section 2518 sets forth the requirements for issuance of a wiretap warrant.  In particular, the government must submit a written application to the issuing magistrate laying out,

among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c). This provision is called the "necessity requirement." *See, e.g.*, *United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999). "The purpose of this requirement is to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Id.* (quoting *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995)) (internal quotation marks and further citation omitted). "Traditional investigative techniques" include surveillance, infiltration or undercover work, questioning of participants, execution of search warrants, and the use of pen registers and trap-and-trace devices. *See, e.g.*, *United States v. Ramirez*, 479 F.3d 1229, 1240 (10th Cir. 2007); *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n.2 (10th Cir. 2002). Section 2518 does not, however, mandate exhaustion of all possibilities; the requirement is "met if the government demonstrates either [that] normal investigatory techniques have been tried and failed or that they 'reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try.'" *Ramirez*, 479 F.3d at 1240 (quoting *United States v. Castillo-Garcia*, 117 F.3d 1179, 1187 (10th Cir. 1997)). The necessity requirement is not to be treated hypertechnically. We expect the government to act "in a common sense fashion," and on review we will take in "all the facts and circumstances in order to

-5-

determine whether the government's showing of necessity is sufficient to justify a wiretap." *Ramirez-Encarnacion*, 291 F.3d at 1222 (internal quotation marks omitted). The overall burden on the government "is not great." *United States v. Wilson*, 484 F.3d 267, 281 (4th Cir. 2007) (internal quotation marks omitted); *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006) (internal quotation marks omitted); *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975).

Once a wiretap has been authorized by a judge, it is presumed proper and the burden is on the defendant to prove its invalidity. *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir. 2003). On appeal, therefore, we review *de novo* whether "a full and complete statement" was submitted under 18 U.S.C. § 2518(1)(c), and we review for abuse of discretion the conclusion that a wiretap was necessary. *Ramirez-Encarnacion*, 291 F.3d at 1222 & n.1.

Three wiretap applications are now at issue: those for target phones ("TP") 2, 3, and 4. Each application was supported by a lengthy affidavit from DEA Special Agent Shawn Buck. In this Court, Appellants assert that the government failed to make a sufficient showing of necessity, because these wiretap applications did not demonstrate the insufficiency of surveillance, questioning of witnesses or participants, use of search warrants, or infiltration. After review, we cannot agree.

As to the insufficiency and limitations of surveillance, the affidavits filed with the applications are quite thoroughly explanatory. *See* Aplts' Br., Vol. II,

att. 1 ("TP2 Aff.") ¶¶ 40–53, at 18–23; att. 3 ("TP3 Aff.") ¶¶ 52–68, at 22–28; att. 5 ("TP4 Aff.") ¶¶ 54–72, at 23–30.  The affidavits describe the fairly extensive surveillance that was conducted beginning in February 2004.  They describe how the subjects became evasive under surveillance, and note that continued blanket surveillance would likely compromise the investigation.  Furthermore, the affidavits explain that visual surveillance, however successful, cannot do much to establish the relationships between the investigation's subjects, the structure of their organization, the purposes of meetings, or the sources of their drug supply.  *See* TP2 Aff. ¶¶ 48, 50, at 21–22; TP3 Aff. ¶¶ 63, 65, at 26–27; TP4 Aff. ¶¶ 67, 69, at 28–29.  Appellants argue that the affidavits do not show that surveillance had failed or had become too dangerous to continue.  Indeed, the affidavits clearly show that surveillance was successful.  But it was successful only to a point, and Appellants have shown no deficiency in the government's proffered rationale for needing wiretaps to move to another level.

As to interrogation of subjects, the applications were also sufficient.  *See* TP2 Aff. ¶¶ 79–84, at 32–34; TP3 Aff. ¶¶ 83–88, at 33–35; TP4 Aff. ¶¶ 87–92, at 35–37.  Appellants note that law enforcement apprehended organization members Francisco Acosta, Octavio Giner, and Brandy Walter, and could have asked them questions.  (Walter was arrested after the TP2 application.)  The affidavits spell out the information learned in interviews with these subjects, but they state, "[B]ecause such individuals fear for their physical safety, and the safety of their

family, their own culpability and the timeliness of the information provided, I believe such interviews would not identify the full scope of the drug trafficking activities of the Fidencio GARCIA-VERDIN organization. . . . Further interviews of members of the . . . organization could possibly jeopardize the investigation." TP3 Aff. ¶ 87, at 35; TP4 Aff. ¶ 91, at 37; *see* TP2 Aff. ¶ 83, at 34.

As to use of search warrants, the wiretap applications adequately explained why they could not be used. Specifically, "large-scale drug trafficking organizations maintain numerous locations to store their drugs and drug proceeds. . . . Searches at these locations would alert the TARGET SUBJECTS to the government's investigation and cause them to flee the country and/or drastically change their operations." TP2 Aff. ¶¶ 54, at 23; TP3 Aff. ¶¶ 69, at 28; TP4 Aff. ¶¶ 73, at 30. It would have been impracticable to bust every relevant location at once, and doing so piecemeal would have blown the secrecy of the investigation irrevocably. Furthermore, searches alone "would not lead to the identity of all the members of the Target Organization nor the full scope of its drug trafficking activities." *Id.*; *see generally* TP2 Aff. ¶¶ 54–56, at 23–24; TP3 Aff. ¶¶ 69–71, at 28–29; TP4 Aff. ¶¶ 73–75, at 30–31.

Mr. Verdin-Garcia and Mr. Romero also argue that the government should have infiltrated their organization with moles or undercover agents rather than obtain wiretaps. But the affidavits explained why infiltration and undercover work could not reasonably have been expected to succeed: the tight-knit, familial

Verdin-Garcia organization would be exceedingly unlikely to accept outsiders into its confidence. *See* TP2 Aff. ¶¶ 34–39, at 17–18; TP3 Aff. ¶¶ 46–51, at 20–21; TP4 Aff. ¶¶ 48–53, at 21–23.

In considering whether the government acted "in a common sense fashion" on this issue, we are keenly aware that "[i]nfiltration of a criminal organization is extremely dangerous and is used sparingly by most law enforcement agencies." GREGORY D. LEE, GLOBAL DRUG ENFORCEMENT: PRACTICAL INVESTIGATIVE TECHNIQUES 116 (2004). From the target's standpoint, the deceptive physical intrusion of an undercover government agent into his group, seeing and hearing everything, might be thought indescribably more burdensome than the eavesdropping of an unnoticed ear upon telephone calls only. And from the government's standpoint, whereas wiretapping is carried on from a distance, undercover work requires direct proximity and interaction between wary criminals and exposed officers, with weapons often close to hand. Certainly, undercover work presents an exceedingly grave risk of harm or death to the agent if he is discovered. And "[t]he most dangerous undercover assignments involve efforts to infiltrate various elements of the narcotics trade. The largest percentage of officers who are hurt or killed on duty have been involved in undercover narcotics operations." THEODORE H. BLAU, PSYCHOLOGICAL SERVICES FOR LAW ENFORCEMENT 145 (1994 ) (citation omitted). *See also* DERRICK PARKER & MATT DIEHL, NOTORIOUS C.O.P.: THE INSIDE STORY OF THE TUPAC, BIGGIE, AND JAM

MASTER JAY INVESTIGATIONS FROM THE NYPD'S FIRST "HIP-HOP COP" 41 (2006) ("I knew undercover narcotics work was dangerous. I knew undercover cops had died in the line of duty. . . . You're living a fast life that's not yours, handling real drugs, and you've got to be very convincing—or you could be killed.").

Applying abuse-of-discretion review to the district court's conclusion, we readily agree that the government met its burden of showing both that infiltration of the close-knit Verdin-Garcia organization would be unlikely to succeed, and that any attempt would be excessively dangerous.

Appellants' two remaining arguments are (1) that the government did not show that it had "paused to reconsider the ordinary investigative measures" before seeking the wiretaps on TP3 and TP4, Aplts' Br., Vol. I, at 19, and (2) that the government should not have attached to the TP2 application two state wiretap applications relating to the same target individuals. As to the first argument, the TP3 and TP4 applications each displays new discussion of information learned, surveillance conducted, and so on, subsequent to the previous wiretap application. The explanations they provided *in toto* are still sufficient, and we can see little to be gained by requiring the government to insert, "We have paused to reconsider, and still believe . . ." into every paragraph. More importantly, the TP3 and TP4 applications were not occasioned by a desire to expand the scope of the investigation, but by the fact that the targets were dumping phones and using multiple phones. Where the government has once demonstrated "sufficient

necessity to wiretap," a target cannot "defeat this showing of necessity simply by changing phone numbers." *United States v. Castillo-Garcia*, 117 F.3d 1179, 1196 (10th Cir. 1997), *overruled on other grounds by United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002).

As to the last argument, 18 U.S.C. § 2518(1)(e) requires disclosure of "a full and complete statement of the facts concerning all previous applications" for wiretaps on the same individuals. Appellants say this information should have been summarized in Agent Buck's affidavit, and that the previous applications should not simply have been attached. We will surely not impose a rule faulting the government for providing too much information about their investigation. Although a wiretap application and affidavit must be sufficient in themselves to meet the demands of § 2518, no authority actively prohibits attaching previous affidavits, or indeed supplementing the application with any other materials which may help the magistrate better understand the course of the investigation.

### B. Translation of Wiretap Recordings

Appellants argue next that the district court should have held a *Daubert* hearing on the admission of translations of intercepted phone calls, and should have excluded them. At trial, the government offered the testimony of Sara Gardner, an experienced translator, who had translated some 3000 wiretap-recorded phone calls from Spanish to English for the government. The recordings

themselves were admitted as substantive evidence; the translations were shown to the jury for demonstrative purposes only.

The government had asked Ms. Garner, in translating ambiguous words, to provide all possible meanings so that the jury could decide for itself in each case what was meant. In this appeal, Appellants quarrel with her alternative interpretation of the recurring Spanish word *jale* as "work, gig, job, [or] dope." *E.g.*, Aplee's App. Vol. I, exh. 155, at 4; Vol. II, exh. 235; Vol. III, exh. 440, at 1; Vol. IV, exh. 665. (It could also mean "snort [of cocaine]," but Ms. Gardner omitted that possibility at the government's request because it might be objectionable as overly prejudicial. Appellants brought it out on cross, however.) Appellants argue that providing the possible meaning "dope" was not translation but rather code-language interpretation, for which they say Ms. Gardner was not qualified. However, they did not cross-examine Ms. Gardner on the word *jale*, or call their own translator.

A translator may "provide nonliteral translation" of "slang terms or idioms which are widely used and understood by the native speakers of the foreign language." *United States v. Gonzalez*, 365 F.3d 656, 660 (8th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1107 (2005), *previous opinion adopted in relevant part*, 188 F. App'x 547, 548 n.2 (8th Cir. 2006). Terms like "420" and "714s," for instance, do not require decoding or code-cracking to understand; it may take nothing but street savvy to know that they refer to marijuana usage

and Quaaludes.  Once foundation is laid that a translator has that savvy, her translation of drug slang is no more a matter of opinion than her translation of any other slang or idiomatic usage.  Differences of opinion on the proper meaning or translation of a slang term are to be resolved—as with other disputes concerning translation—through cross-examination or by the presentation of another qualified translator with a contrary view.

In this case, Ms. Gardner testified that she was familiar with the Nayarit region of Mexico and with its slang, that she had received training on the slang terms of the various regions of Mexico, and that she had interpreted in numerous conversations involving natives of Nayarit.  She testified specifically, "Well, for the word *jale*, I have heard Mexicans use that term in the drug culture, based on the many interpreting jobs I've done, that they use that to refer to dope, drugs in general."  R., Vol. V, at 529.  She also testified that, in selecting the possible meanings she provided for the term *jale*, she relied on a variety of resources including books and the assistance and expertise of other interpreters.  She agreed that the rendition "work, gig, job, [or] dope" was "based on all [her] training and experience as to what that slang term could mean."  *Id.* at 534.

Accordingly, the evidence established that the term *jale* was not code, but slang within the drug subculture of the defendants' region of origin.  Ms. Gardner's training and experience provided her with the ability to understand, and therefore to translate, the term.

C.  Interception of Prison Phone Calls

Appellants were held prior to trial at a Correctional Corp. of America ("CCA") facility in Leavenworth, Kansas.  Because they had refused to cooperate in providing voluntary voice exemplars as ordered by the district court, the government recorded calls they made on prison telephones.  These recordings were then used as exemplars by a case agent to identify the speakers in the calls that had been recorded during the investigation.  Mr. Verdin-Garcia moved to suppress the use of these prison recordings under Title III of the Wiretap Act.  Mr. Romero did not join the motion and appears not otherwise to have preserved the issue.[1]

On appeal, the issue is whether the prison recordings fall within the "prior consent" exception to the Wiretap Act.  Under this provision, it is lawful "for a person acting under color of law to intercept a wire, oral, or electronic communication, where . . . one of the parties to the communication has given prior consent to such interception."  18 U.S.C. § 2511(2)(c).  The government argues that Mr. Verdin-Garcia's consent can be implied from his decision to use the prison telephone despite adequate warnings that doing so would subject his communications to monitoring.  We agree.

---

[1] Mr. Romero did file a *pro se* motion to suppress "any and all evidence in the case at bar."  Dist. Dkt. Doc. 130, at 1.  The motion did not otherwise specify what evidence was meant or offer any reason why it should be suppressed.  This is insufficient to preserve the issue for Mr. Romero.

CCA employee Richard Shanks testified that prominent signs next to the telephones at the prison proclaimed, "All calls may be recorded/monitored," in both English and Spanish. R., Vol. IV, at 317–18. He also testified that new inmates at the facility, including specifically Mr. Verdin-Garcia, undergo orientation and receive handbooks in their choice of English or Spanish, and that those handbooks state that all calls may be monitored. *Id.* at 319–22, 324–25. Officer Norma Lorenzo, the agent who used the recorded exemplars to conduct voice identifications, testified that when a CCA inmate places a phone call, a recorded message prompts the caller to select English or Spanish, and then informs the caller in the language of his choice that all calls are subject to being monitored and recorded. This was the case, she stated, on every one of the recorded calls which she used as voice exemplars.

In this appeal, Mr. Verdin-Garcia hangs his hat on two arguments: that "subject to being recorded" is not the same as "will be recorded," so his use of the telephone with knowledge of the former was not really implied consent to the latter; and in the alternative that express consent to being recorded, not implied consent, is required under the Wiretap Act. The first argument is unpersuasive. There is no evidence that all calls made by CCA inmates *were* recorded, and we can see no reason to require that prison officials either record all calls or lie to the inmates that they are doing so.

-15-

Nor is the prisoner's express consent necessary; implied consent will satisfy the statute. We note that by this term we mean actual consent inferred from circumstances other than an express declaration, and not constructive consent implied by operation of law. *See United States v. Corona-Chavez*, 328 F.3d 974, 978–79 (8th Cir. 2003); *Williams v. Poulos*, 11 F.3d 271, 281 (1st Cir. 1993). A prisoner's voluntarily made choice—even a Hobson's choice—to use a telephone he knows may be monitored implies his consent to be monitored. Thus we stated in *United States v. Faulkner*, 439 F.3d 1221, 1225 (10th Cir. 2006), that "we have no hesitation in concluding that a prisoner's knowing choice to use a monitored phone is a legitimate 'consent' under the Wiretap Act."

Mr. Verdin-Garcia argues on appeal that consent cannot be inferred from circumstances. We have already held that it can, however, where awareness and a voluntary choice are present. The real issue in this case is whether awareness can be inferred from circumstances. Like the prisoner in *Faulkner*, Mr. Verdin-Garcia did not express consent to the monitoring. Unlike the prisoner in *Faulkner*, however, Mr. Verdin-Garcia did not expressly acknowledge his *awareness* of the monitoring. We hold that such an expression is not necessary.

A number of decisions from other circuits applying Title III's consent requirement confirm our view. In *United States v. Horr*, 963 F.2d 1124, 1126 (8th Cir. 1992), the Eighth Circuit found implied consent to record where an inmate had received a guidebook, and signs were posted, stating, "The Bureau of

Prisons has the authority to monitor conversations on this telephone. Your use of the institutional telephone constitutes consent to this monitoring." *See also Corona-Chavez*, 328 F.3d at 978 ("When someone voluntarily participates in a telephone conversation knowing that the call is being intercepted, this conduct supports a finding of implied consent to the interception."). Several Second Circuit decisions have also found implied consent where warnings were given, even without "constitutes consent" language in those warnings. *United States v. Workman*, 80 F.3d 688, 693–94 (2d Cir. 1996) (implied consent where inmate guidebook and signs near telephones stated calls were subject to monitoring); *United States v. Amen*, 831 F.2d 373, 378–79 (2d Cir. 1996) (implied consent where prison regulations, orientation lecture, and inmate guidebook stated calls were subject to monitoring). Use of the prison telephone is a privilege, not a right, and we agree with the other circuits having considered the question that where the warnings given and other circumstances establish the prisoner's awareness of the possibility of monitoring or recording, his decision to take advantage of that privilege implies consent to the conditions placed upon it.

D. Sentencing

Finally, Appellants challenge their sentences. They assert that their sentences were incorrectly calculated because they were held responsible for excessive drug amounts; they charge that the sentencing judge failed to consider several of the factors of sentencing set forth in 18 U.S.C. § 3553(a); and they

claim that the sentences imposed were substantively unreasonable. The

arguments do not persuade.

After *United States v. Booker*, 543 U.S. 220, 262 (2005), we review

sentences for "reasonableness." Reasonableness review is a two-step process

comprising a procedural and a substantive component. *Gall v. United States*, 128

S. Ct. 586, 597 (2007). The former inquiry is whether the sentencing court

committed any "significant procedural error, such as failing to calculate (or

improperly calculating) the Guidelines range, treating the Guidelines as

mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on

clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.*

The substantive reasonableness inquiry "involves whether the length of the

sentence is reasonable given all the circumstances of the case in light of the

factors set forth in 18 U.S.C. § 3553(a)." *United States v. Conlan*, 500 F.3d 1167,

1169 (10th Cir. 2007).

### 1. Procedural Reasonableness

Mr. Romero raises several objections to the inclusion of eight particular

quantities of narcotics as relevant conduct in determining his offense level.[2] The

---

[2] Although Mr. Verdin-Garcia and Mr. Romero filed a joint brief in this appeal, the arguments relating to calculation of drug amounts refer only to Mr. Romero's PSR, and mention only Mr. Romero's objections thereto. We therefore consider Mr. Verdin-Garcia not to have raised these arguments on appeal. Were we to examine these issues with respect to Mr. Verdin-Garcia, however, the same facts and logic would lead us to affirm.

government's addendum to Mr. Romero's Presentence Investigation Report (PSR) mentions, for instance, a telephone call in which Eduardo "Tres Pelos" Lopez orders twelve pounds of methamphetamine from Mr. Verdin-Garcia, and the testimony of Arturo Zuniga that he repeatedly purchased 2- to 4-ounce quantities of "ice" methamphetamine from the defendants. With respect to these and other quantities, Mr. Romero argues (1) that none of the substances alluded to was ever seized and tested in a laboratory; (2) that the use of the term "ice" in testimony was only colloquial and should not be taken as establishing that the narcotics mentioned were actually "ice" methamphetamine, *i.e.* at least 80% pure, for purposes of calculations under the Sentencing Guidelines (one gram of "ice" is punished as ten grams of standard methamphetamine); and (3) that transactions carried on by Mr. Verdin-Garcia should not be attributed to Mr. Romero, because the evidence did not sufficiently show the relationship between them. Last, both appellants argue that the district court committed error by failing to consider all the sentencing factors enumerated in 18 U.S.C. § 3553(a).

Narcotics need not be seized or tested to be held against a defendant at sentencing. "'When the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an estimate to establish the defendant's guideline offense level so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability.'" *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005)

(quoting *United States v. Ruiz-Castro*, 92 F.3d 1519, 1534 (10th Cir. 1996)) (further quotation omitted); *see* U.S.S.G. § 2D1.1 cmt. 12 ("Where there is no drug seizure . . . the court shall approximate the quantity of the controlled substance."). Laboratory test results are perhaps more persuasive evidence of amounts and purities than eyewitness testimony or wiretapped conversations, but they are not unreliable as a matter of law. The issue is whether an amount or purity is established by a preponderance of the total sum of the evidence. With the two exceptions mentioned next, Mr. Romero does not argue on appeal the insufficiency of the evidence to support the drug quantities at issue. The claim he appears to make, that the absence of seizure or testing makes a drug quantity *per se* unreliable, fails.

For calculations under the Sentencing Guidelines where several different drugs are involved, drugs other than marijuana are convertible into "marijuana equivalents" so that apples may be added to apples to determine an offense level. Under the Guidelines, 1 gram of methamphetamine mixture is equivalent to 2 kilograms of marijuana, while 1 gram of "ice" or 1 gram of methamphetamine (actual) is equivalent to 20 kilograms of marijuana. U.S.S.G. § 2D1.1, cmt. 10 (2006). "Ice" is a methamphetamine mixture of at least 80% purity (at least 80% d-methamphetamine hydrochloride and no more than 20% cutting agent), and methamphetamine (actual) means the actual weight of the pure d-methamphetamine hydrochloride in a mixture. *Id.*, § 2D1.1(c) nn.B, C.

To simplify our analysis, we observe that any amount of narcotics over 30,000 kilograms of marijuana equivalents is superfluous for Guidelines purposes, because 30,000 yields the maximum possible base offense level, 38. *Id.*, § 2D1.1(c)(1). Here, Mr. Romero does not object to the inclusion of 14,753 kilograms of marijuana equivalents in determining his base offense level. Thus the dispute is really over the existence of enough narcotics to make up the 15,247 kilograms necessary to reach the 30,000 barrier. That amount is equivalent to 762.35 grams of "ice" or methamphetamine (actual), which is only 1.6807 pounds.

The eight quantities to which Mr. Romero objects include 5443 grams of methamphetamine mixture and 5 pounds, 6.5 ounces (2452.2 grams) of alleged "ice." It does not matter, despite Mr. Romero's arguments, whether this latter quantity meets the legal definition, 80% purity, of "ice." If it were of even a scant 33% purity, it would contain 809.2 grams of methamphetamine (actual) and so would be enough by itself to push Mr. Romero past the 30,000 kilogram barrier. And if one includes the other 5443.2 grams of methamphetamine mixture, one can forget purity altogether. For if the 2452.2 grams at issue were not true "ice" they were, at minimum, methamphetamine mixture, and the total is then 7895.4 grams of methamphetamine mixture, which is equivalent to 15,790.8 kilograms of marijuana—also enough to tip Mr. Romero over the brink. We therefore need not reach at all the question whether the evidence was sufficient to

prove by a preponderance that the disputed narcotics alleged to be "ice" were in fact 80% pure.

The next issue is whether the evidence was sufficient to support holding Mr. Romero responsible for drug amounts with which only Mr. Verdin-Garcia was directly involved. In this case, the indictment charged that the two, among others, "did knowingly, and unlawfully combine, conspire, and agree with each other . . . to distribute and possess with intent to distribute" methamphetamine and marijuana. R., Vol. I, doc. 1, at 1–2. Both were convicted. On this issue, Mr. Romero disputes only that he and Mr. Verdin-Garcia "were equal partners in everything," Aplts' Br., Vol. I, at 41, but he does not challenge the sufficiency of the evidence to support his conspiracy conviction. Since the conviction stands, we must accept that these defendants combined and conspired to distribute methamphetamine and marijuana.

A defendant convicted of conspiracy may properly be held responsible for all conduct of co-conspirators that was in furtherance of the conspiracy and was reasonably foreseeable in connection therewith. *United States v. Dazey*, 403 F.3d 1147, 1173 n.3 (10th Cir. 2005). "For a conspiracy is a partnership in crime; and an 'overt act of one partner may be the act of all without any new agreement specifically directed to that act.'" *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253–54 (1940) (quoting *United States v. Kissel*, 218 U.S. 601, 608 (1910)). Accordingly "[i]t is well established that, upon his conviction of

-22-

conspiracy to possess with intent to distribute [narcotics, a defendant is] accountable for that drug quantity which was within the scope of the agreement and reasonably foreseeable to him." *United States v. Hernandez*, 509 F.3d 1290, 1298 (10th Cir. 2007) (internal brackets and quotation marks omitted); *accord United States v. Topete-Plascencia*, 351 F.3d 454, 459 (10th Cir. 2003); *see* U.S.S.G. § 1B1.3(a)(1)(B).

Even if it were true that Mr. Romero was not an "equal partner" with Mr. Verdin-Garcia in this conspiracy, that would not lessen his accountability for the drug quantities involved. The issue is whether Mr. Verdin-Garcia's drug transactions were carried out within the scope of the conspiracy and foreseeably to Mr. Romero. Mr. Romero does not argue that they were not.

Last, Appellants both argue that the district court committed procedural error because it did not expressly mention several of the factors listed as sentencing considerations in 18 U.S.C. § 3553(a). However, the Supreme Court has recently clarified that, although some explanation of a judge's sentencing decision is required, "when a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation." *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007). As we made clear in *United States v. Rines*, 419 F.3d 1104 (10th Cir. 2005), a district court need not "march through § 3553(a)'s sentencing factors," nor do we "demand that the district court recite any magic words to show that it fulfilled its responsibility to be mindful of the

-23-

factors that Congress has instructed it to consider." *Id.* at 1107; *see also United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1202 (10th Cir. 2007) ("[A] specific discussion of Section 3553(a) factors is not required for sentences falling within the ranges suggested by the Guidelines."); *United States v. Lopez-Flores*, 444 F.3d 1218, 1222 (10th Cir. 2006) (collecting cases). Thus it is not enough to say, as Appellants do here, that the court failed for instance to "discuss the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty or [*sic*] similar conduct." Aplts' Br., Vol. I, at 47. Appellants must have raised a nonfrivolous argument below showing, by more than hand-waving or conclusory statements, the likelihood of a sentencing disparity if the Guidelines were followed. This they did not do.

## 2. *Substantive Reasonableness*

Finally, Appellants charge that the life sentences imposed in this case were greater than necessary to comply with the purposes of sentencing. Our review of the substantive reasonableness of a sentence is limited to determining whether the sentencing judge abused his discretion. *See Rita*, 127 S. Ct. at 2465; *United States v. Angel-Guzman*, 506 F.3d 1007, 1014–15 (10th Cir. 2007). A sentence within the correctly calculated Guidelines range is presumed to be reasonable, *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006); the burden is on the

appellant to rebut the presumption.[3]  That burden is a hefty one, because abuse-of-discretion is a deferential standard of review.  *See Gall*, 128 S. Ct. at 591; *Angel-Guzman*, 506 F.3d at 1015.

At Appellants' joint sentencing hearing, the district judge explained at length why he believed life sentences to be appropriate.  He observed,

> The seriousness of this offense is underscored by the tremendous quantity of drugs that are involved here.  I really haven't attempted to engage in a comparative analysis of trials and/or other cases that I have had contact with over almost 15 years of doing this job, but this certainly is one of the most significant quantities of drugs that I have seen involved in a prosecution.

R., Vol. X, at 2279–80.  He also addressed Mr. Verdin-Garcia and Mr. Romero individually.  An extensive retelling of the judge's findings and rationale is unnecessary, but in brief he laid out how this conspiracy used young family members for drug work and how Appellants had possessed firearms in connection with their trafficking.  *Id.* at 2280, 2307.  The judge stated that Mr. Verdin-Garcia had shown "absolutely no respect for the law at any stage," had "absolutely no redeeming qualities," displayed an "absolute lack of remorse," and had appeared bored at his own trial, *id.* at 2280–81, and noted that "his status as an illegal immigrant demonstrates a separate example of his disregard for the laws of this

---

[3] Appellants argue that we should overrule *Kristl* and refuse to apply a presumption of reasonableness to within-Guidelines sentences.  One panel of this court may not overrule another.  Moreover, *Rita*, handed down after Appellants' brief was submitted, confirms that this presumption is permissible.  *See Rita*, 127 S. Ct at 2466–67.

country," *id.* at 2283. Mr. Verdin-Garcia had, the judge said, "demonstrated that he is a person who will engage in criminal conduct as long as he has the opportunity to do so." *Id.* at 2281. As to Mr. Romero, after considering his conduct and observing his actions the judge stated, "It's apparent to me that Mr. Romero does not have any respect for the law." *Id.* at 2308. Mr. Romero displayed a "lack of remorse," and had a "propensity to reoffend and come back into this country after his prior conviction" and deportation for drug trafficking. *Id.* The judge reiterated as well the magnitude of Mr. Romero's crimes. *Id.* at 2306–07. In light of these explanations, we cannot find the sentences an abuse of discretion.

Mr. Verdin-Garcia argues that sentencing disparity among co-defendants requires a lower sentence.[4] His co-defendants Graciela Reynoso and Maria Verdin received respective sentences of 14 and 48 months. But Ms. Reynoso, the defendant's wife, pleaded guilty to one count of misprision of felony, and Ms. Verdin, his sister, to one count of use of a communication facility to facilitate the commission of a drug felony. *See* Dist. Dkt. Docs. 183, 186. These were Class E felonies. By contrast, Mr. Verdin-Garcia was convicted of one count of conspiracy and two counts of distribution of methamphetamine, Class A felonies, plus eleven counts of the Class E felony of using a communication facility. R., Vol. II, doc. 214. The evidence bountifully established that Mr. Verdin-Garcia

---

[4] Only he raised this argument below. *See* R., Vol. II, doc. 201, at 3.

was the kingpin, or one of two, of the Kansas City branch of this conspiracy, that he was responsible for distributing very large amounts of drugs, and that he was using his own family members to carry out his plans. We would likely reverse if his sentence were *not* disparate from theirs.

Moreover, even if sentencing disparities among co-defendants may be considered by district courts in the exercise of their sentencing discretion, *see Gall*, 128 S. Ct. at 599–600, 18 U.S.C. § 3553(a)(6) requires a judge to take into account only disparities *nationwide* among defendants with similar records and Guideline calculations. *See United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2006); *United States v. Gallegos*, 129 F.3d 1140, 1143 (10th Cir. 1997). It is not reversible error for a sentencing court to adhere to this interpretation in its exercise of sentencing discretion.

Accordingly, "tak[ing] into account the totality of the circumstances," *Gall*, 128 S. Ct. at 597, we are satisfied that the life sentences of both appellants are reasonable.

### III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of conviction and sentence as to both appellants, Fidencio Verdin-Garcia and Miguel Romero.